# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN P. KENNEDY, JOHN PHILLIP )
HINDERAKER, VIRGINIA F. HINDERAKER, )
DAVID WALSH, ROBERT WHITNEY, )
FRANK R. SHIBILSKI,  JOHN FEITH, )
DAVID BRUCK, SANDRA BRUCK, )
HERTNER ASSOCIATES, INC. DEFINED )
BENEFIT PLAN, YALE N. KAPLAN TRUST, )
CHARLES M. STERN TRUST, )
STONERIDGE PARTNERS, LLC, )
RANDY GREWALL, RICHARD NEWELL, )
MARIO GIACONE, JR., ERIC KAPLAN, )
TALIA GREENFIELD, AMANDA )
GREENFIELD, MICHELLE GREENFIELD, )
ASHER GREENFIELD, IAN GREENFIELD, )
MICHAEL A. BARCLAY, NIKHIL )
NAGASWAMI, SANDY SUNDRAM, M.D., )
TIMOTHY J. MCKAY, HUGH G. MCBREEN, )
GNANESH COOMARASWAMY, IAN )
ELFENBAUM, FREDERICK H. KOPKO, JR., )
SAL PULITANO, EDWARD J. WEINER, )
ALBERT WEINER, RUTH SIEGEL, )
FLOR WEINER, HOWARD SCHACHTER, )
DIANE SCHACHTER,  JAMES R. STERN, )
RANDI KAPLAN  STERN, JOHN N. STERN, )
DOT CHIN, CAROLYN R. WOLFE, )
MATTHEW P. LEVINE, )
ALAN R. HIRSCH, M.D., THOMAS P. )
VALENTI, JILL MOORE, )
VLADIMIR MARINKOVICH, ANTOINE )
WAKIM, PAUL E. WAKIM, )
SOFIJA OSTOJIC, DANIEL R. PUCCI, )
RANDALL B. HABERMAN, )
RICHARD SCIORTINO, DEANNE DEGRAFF, )
THOMAS J. WITT,  LISA K. WITT, )
JOEL  HABERMAN, NICOLE DeBORTOLO, )
DANIEL R. MARTIN, MIRA DJORDJIC, )
JEFFREY R. WESCOTT, MAURA ANN )
McBREEN,   THOMAS J.  BRADLEY, )
PAUL J. McBREEN, ANNIE K. STROBL, )
SIOBHAN McBREEN BURKE, )
DEIRDRE F.  McBREEN, )





02C  0383

DOCKETED
JAN 1 7 2002

JUDGE HOLDERMAN

MAGISTRATE JUDGE KEYS



DOUGLAS M. MILLER, NICK NACHICH,   )
BOSCO MOMICH, SIMEONA MOMICH,   )
EDWARD MILLER, ESTATE OF DONALD   )
H. BROUDY, JOEL E. COHEN,   )
ESTATE OF ADAM J. RICE, JAMES N. DAY, )
ALVIN B. GALUTEN, BRUCE E. MATES   )
REVOCABLE TRUST DATED JULY 24, 1996, )
GORDON EVANS, JUDY EVANS,   )
JESSE GREENFIELD I.R.A.,   )
GREENFIELD CHILDREN'S PARTNERSHIP, )
EJADA LIMITED PARTNERSHIP, ALEXIS   )
J. RIVERA, DEBORAH V. RIVERA,   )
ROBERT K. SAVAGE, J. FELIX CAMPOS,   )
JOYCE CAMPOS, CHARLES WATTERSON, )
KAREN WATTERSON, ROBERT GILMAN,   )
GERARDO A. ACOSTA, BILLIE D. ENNIS,   )
KATHRYN M. ENNIS, MICHAEL MOSES,   )
MARY MOSES, STEPHEN M. BROWN,   )
SCOTT N. FLANDERS, KENNETH J.   )
ACKERMAN, JASNA SRECKOVIC,   )
DRAGISA MIRJANICH, GORDANA   )
MIRJANICH, GEORGE SRECKOVIC,   )
VUKASIN PAVLOVIC, MIROSLAV JAKSIC, )
and GUNNALLEN FINANCIAL, INC.   )
   )    No.
      Plaintiffs,   )
   )
      v.   )    Jury Trial Demanded
   )
VENROCK ASSOCIATES,   )
VENROCK ASSOCIATES II, L.P.,   )
VENROCK ENTREPRENEURS FUND, L.P., )
HAMBRECHT & QUIST CALIFORNIA,   )
H&Q EMPLOYEE VENTURE FUND   )
2000, L.P., ACCESS TECHNOLOGY   )
PARTNERS II, L.P., ACCESS TECHNOLOGY )
PARTNERS BROKERS FUND, L.P.,   )
H&Q CADANT INVESTORS, L.P.,   )
CHASE EQUITY ASSOCIATES, L.L.C.,   )
J.P. MORGAN PARTNERS, LLC, KB   )
PARTNERS VENTURE FUND II, L.P., KB   )
PARTNERS AFFILIATES FUND II, L.P.,   )
ERIC COPELAND, C.H. RANDOLPH LYON, )
STEPHAN OPPENHEIMER,   )
KEITH BANK, CHARLES WALKER,   )
VENTURE LAW GROUP, and CADANT, INC. )

|                  |   |
|------------------|---|
| Defendants.      | ) |
|                  | ) |

## COMPLAINT AT LAW

NOW COMES Plaintiffs JOHN P. KENNEDY, et al., by their attorneys, and complaining against defendants VENNROCK ASSOCIATES, et al. allege as follows:

### NATURE OF THE ACTION

1.  This matter arises out of defendants scheme to defraud plaintiffs by manipulating the corporate affairs of Cadant, Inc. through fraudulent and misleading representations in order to enrich themselves by increasing the value of their interest in Cadant, Inc. while diluting the interests of the common shareholders, in breach of their fiduciary duties to plaintiffs under federal securities law and principles of fiduciary duty.

### THE PARTIES
### A. PLAINTIFFS

2.  Plaintiffs are all common shareholders of Cadant, Inc.

3.  At all relevant times Plaintiff JOHN P. KENNEDY was a resident of the state of Illinois, County of Cook.

4.  At all relevant times Plaintiff JOHN PHILLIP was a resident of the state of Wisconsin.

5.  At all relevant times Plaintiff VIRGINIA F. HINDERAKER was a resident of the state of Wisconsin.

6.  At all relevant times Plaintiff DAVID WALSH was a resident of the state of Wisconsin.

7.  At all relevant times Plaintiff ROBERT WHITNEY was a resident of the state of Wisconsin.

8.  At all relevant times Plaintiff FRANK R. SHIBILSKI was a resident of the state of Wisoconsin.

9.    At all relevant times Plaintiff JOHN FEITH was a resident of the state of Wisconsin.

10.   At all relevant times Plaintiff DAVID BRUCK was a resident of the state of Florida.

11.   At all relevant times Plaintiff SANDRA BRUCK was a resident of the state of Florida.

12.   At all relevant times Plaintiff HERTNER ASSOCIATES, INC. DEFINED BENEFIT
      PLAN was a resident of the state of Florida.

13.   At all relevant times Plaintiff YALE N. KAPLAN TRUST was a resident of the state of
      Illinois, County of Cook .

14.   At all relevant times Plaintiff CHARLES M. STERN TRUST was a resident of the state
      of Illinois, County of Cook.

15.   At all relevant times Plaintiff STONERIDGE PARTNERS, LLC was organized in the
      state of California.

16.   At all relevant times Plaintiff RANDY GREWALL was a resident of the state of Airzona.

17.   At all relevant times Plaintiff RICHARD NEWELL was a resident of the state of Indiana.

18.   At all relevant times Plaintiff MARIO GIACONE, JR. was a resident of the state of New
      Jersey.

19.   At all relevant times Plaintiff ERIC KAPLAN was a resident of the state of Wisconsin.

20.   At all relevant times Plaintiff TALIA GREENFIELD was a resident of the state of
      Colorado.

21.   At all relevant times Plaintiff AMANDA GREENFIELD was a resident of the state of
      Colorado.

22.   At all relevant times Plaintiff MICHELLE GREENFIELD was a resident of the state of
      Colorado.

23.     At all relevant times Plaintiff ASHER GREENFIELD was a resident of the state of Colorado.

24.     At all relevant times Plaintiff IAN GREENFIELD was a resident of the state of Colorado.

25.     At all relevant times Plaintiff MICHAEL A. BARCLAY was a resident of the state of Florida.

26.     At all times Plaintiff NIKHIL NAGASWAMI was a resident of Mexico.

27.     At all relevant times Plaintiff SANDY SUNDRAM, M.D., was a resident of the state of Illinois, County of DuPage.

28.     At all relevant times Plaintiff  TIMOTHY J. MCKAY was a resident of the state of Illinois, County of DuPage.

29.     At all relevant times Plaintiff HUGH G. McBREEN was a resident of the state of Illinois, County of Lake.

30.     At all relevant times Plaintiff GNANESH COOMARASWAMY was a resident of the state of Illinois, County of Cook.

31.     At all relevant times Plaintiff IAN ELFENBAUM was a resident of the state of  Illinois, County of Cook.

32.     At all relevant times Plaintiff FREDERICK H. KOPKO, JR. was a resident of the state of Illinois, County of Cook.

33.     At all relevant times Plaintiff SAL PULITANO was a resident of the state of New Jersey.

34.     At all relevant times Plaintiff EDWARD J. WEINER was a resident of the state of Illinois, County of  Lake.

35.     At all relevant times Plaintiff ALBERT WEINER was a resident of the state of  Illinois, County of  Lake.

36.    At all relevant times Plaintiff RUTH SIEGEL was a resident of the state of Illinois, County of Cook.

37.    At all relevant times Plaintiff FLOR WEINER was a resident of the state of Illinois, County of Lake.

38.    At all relevant times Plaintiffs HOWARD SCHACHTER was a resident of the state of Illinois, County of Lake.

39.    At all relevant times Plaintiffs DIANE SCHACHTER was a resident of the state of Illinois, County of Lake.

40.    At all relevant times Plaintiff JAMES R. STERN was a resident of the state of Illinois, County of Cook.

41.    At all relevant times Plaintiff RANDI KAPLAN STERN was a resident of the state of Illinois, County of Cook.

42.    At all relevant times Plaintiff JOHN N. STERN was a resident of the state of Illinois, County of Cook.

43.    At all relevant times Plaintiff DOT CHIN was a resident of the state of Illinois, County of Cook.

44.    At all relevant times Plaintiff CAROLYN R. WOLFE was a resident of the state of Pennsylvania.

45.    At all relevant times Plaintiff MATTHEW P. LEVINE was a resident of the state of Illinois, County of Cook.

46.    At all relevant times Plaintiff ALAN R. HIRSCH, M.D. was a resident of the state of Illinois, County of Lake.

47. At all relevant times Plaintiff THOMAS P. VALENTI was a resident of the state of Illinois, County of Cook.

48. At all relevant times Plaintiff JILL MOORE was a resident of the state of Illinois, County of Cook.

49. At all relevant times Plaintiff VLADIMIR MARINKOVICH was a resident of the state of Illinois, County of Cook.

50. At all relevant times Plaintiff ANTOINE WAKIM was a resident of the state of Kansas.

51. At all relevant times Plaintiff PAUL E. WAKIM was a resident of the state of California.

52. At all relevant times Plaintiff SOFIJA OSTOJIC was a resident of the state of Illinois, County of Cook.

53. At all relevant times Plaintiff DANIEL R. PUCCI was a resident of the state of Illinois, County of DuPage.

54. At all relevant times Plaintiff RANDALL B. HABERMAN was a resident of the state of Illinois, County of Lake.

55. At all relevant times Plaintiff RICHARD SCIORTINO was a resident of the state of Illinois, County of Cook.

56. At all relevant times Plaintiff DEANNE DEGRAFF was a resident of the state of Illinois, County of DuPage.

57. At all relevant times Plaintiff THOMAS J. WITT was a resident of the state of Arizona.

58. At all relevant times Plaintiff LISA K. WITT was a resident of the state of Arizona.

59. At all relevant times Plaintiff JOEL HABERMAN was a resident of the state of Illinois, County of Lake.

60. At all relevant times Plaintiff NICOLE DEBORTOLO was a resident of the state of Illinois, County of Cook.

61. At all relevant times Plaintiff DANIEL R. MARTIN was a resident of the state of Illinois, County of Cook.

62. At all relevant times Plaintiff MIRA DJORDJIC was a resident of the state of Illinois, County of Cook.

63. At all relevant times Plaintiff JEFFREY R. WESCOTT was a resident of the state of Illinois, County of Cook.

64. At all relevant times Plaintiff MAURA ANN McBREEN was a resident of the state of Illinois, County of Cook.

65. At all relevant times Plaintiff THOMAS J. BRADLEY was a resident of the state of Pennsylvania.

66. At all relevant times Plaintiff PAUL J. McBREEN was a resident of the state of Illinois, County of Lake.

67. At all relevant times Plaintiff ANNIE K. STROBL was a resident of the state of Illinois, County of Cook.

68. At all relevant times Plaintiff SIOBHAN McBREEN BURKE was a resident of the state of California.

69. At all relevant times Plaintiff DEIRDRE F. McBREEN was a resident of the state of Illinois, County of Cook.

70. At all relevant times Plaintiff DOUGLAS M. MILLER was a resident of the state of Indiana.

71.    At all relevant times Plaintiff NICK NACHICH was a resident of the state of Illinois, County of DuPage.

72.    At all relevant times Plaintiff BOSCO MOMICH was a resident of the state of Indiana.

73.    At all relevant times Plaintiff SIMEONA MOMICH was a resident of the state of Indiana.

74.    At all relevant times Plaintiff EDWARD MILLER was a resident of the state of Indiana.

75.    At all relevant times the beneficiaries of the estate of Plaintiff DONALD H. BROUDY were residents of the state of Arizona .

76.    At all relevant times Plaintiff JOEL E. COHEN was a resident of the state of Indiana.

77.    At all relevant times the beneficiaries of the estate of Plaintiff ADAM J. RICE were residents of the state of Florida.

78.    At all relevant times Plaintiff JAMES N. DAY was a resident of the state of Ohio.

79.    At all relevant times Plaintiff ALVIN B. GALUTEN was a resident of the state of Kentucky.

80.    At all relevant times Plaintiff BRUCE E. MATES REVOCABLE TRUST DATED JULY 24, 1996 was a resident of the state of Florida.

81.    At all relevant times Plaintiff GORDON EVANS was a resident of the state of Florida.

82.    At all relevant times Plaintiff JUDY EVANS was a resident of the state of Florida.

83.    At all relevant times Plaintiff JESSE GREENFIELD I.R.A. was a resident of the state of Colorado.

84.    At all relevant times Plaintiff GREENFIELD CHILDREN'S PARTNERSHIP was a resident of the state of Florida.

85. At all relevant times Plaintiff EJADA LIMITED PARTNERSHIP was a resident of the state of Wisconsin.

86. At all relevant times Plaintiff ALEXIS J. RIVERA was a resident of the state of Florida.

87. At all relevant times Plaintiff DEBORAH V. RIVERA was a resident of the state of Florida.

88. At all relevant times Plaintiff ROBERT K. SAVAGE was a resident of the state of Florida.

89. At all relevant times Plaintiff J. FELIX CAMPOS was a resident of the state of Florida.

90. At all relevant times Plaintiff JOYCE CAMPOS was a resident of the state of Florida.

91. At all relevant times Plaintiff CHARLES WATTERSON was a resident of the state of Pennsylvania.

92. At all relevant times Plaintiff KAREN WATTERSON was a resident of the state of Pennsylvania.

93. At all relevant times Plaintiff ROBERT GILMAN was a resident of the state of Illinois, County of DuPage.

94. At all relevant times Plaintiff GERARDO A. ACOSTA was a resident of Venezuela

95. At all relevant times Plaintiff BILLIE D. ENNIS was a resident of the state of Florida.

96. At all relevant times Plaintiff KATHRYN M. ENNIS was a resident of the state of Florida.

97. At all relevant times Plaintiff MICHAEL MOSES was a resident of the state of Arizona.

98. At all relevant times Plaintiff MARY MOSES was a resident of the state of Arizona.

99. At all relevant times Plaintiff STEPHEN M. BROWN was a resident of the state of New York.

100. At all relevant times Plaintiff SCOTT N. FLANDERS was a resident of the state of New York.

101. At all relevant times Plaintiff KENNETH J. ACKERMAN was a resident of the state of New York.

102. At all relevant times Plaintiff JASNA SRECKOVIC was a resident of the state of Illinois, County of Cook.

103. At all relevant times Plaintiff DRAGISA MIRJANICH was a resident of the state of Illinois, County of Cook.

104. At all relevant times Plaintiff GORDANA MIRJANICH was a resident of the state of Illinois, County of Cook.

105. At all relevant times Plaintiff GEORGE SRECKOVIC was a resident of the state of Illinois, County of Cook.

106. At all relevant times Plaintiff VUKASIN PAVLOVIC was a resident of the state of Illinois, County of Cook.

107. At all relevant times Plaintiff MIROSLAV JAKSIC was a resident of the state of Michigan.

108. At all relevant times Plaintiff GUNNALLEN FINANCIAL, INC. was incorporated in the state of Florida.

**B. DEFENDANTS**

109. At all relevant times Defendant VENROCK ASSOCIATES conducted business in the state of Illinois.

110. At all relevant times Defendant VENROCK ASSOCIATES II, L.P. conducted business in the state of Illinois.

111. At all relevant times Defendant VENROCK ENTRPRENEURS FUND, L.P. conducted business in the state of Illinois.

112. At all relevant times Defendant HAMBRECHT & QUIST CALIFORNIA conducted business in the state of Illinois.

113. At all relevant times Defendant H&Q EMPLOYEE VENTURE FUND 2000, L.P. conducted business in the state of Illinois.

114. At all relevant times Defendant ACCESS TECHNOLOGY PARTNERS II, L.P. conducted business in the state of Illinois.

115. At all relevant times Defendant ACCESS TECHNOLOGY PARTNERS BROKERS FUND, L.P. conducted business in the state of Illinois.

116. At all relevant times H&Q CADANT INVESTORS, L.P. conducted business in the state of Illinois.

117. At all relevant times Defendant CHASE EQUITY ASSOCIATES, L.L.C. conducted business in the state of Illinois.

118. At all relevant times Defendant J.P. MORGAN PARTNERS, LLC conducted business in the state of Illinois.

119. At all relevant times Defendant KB PARTNERS VENTURE FUND II, L.P. conducted business in the state of Illinois.

120. At all relevant times Defendant KB PARTNERS AFFILIATES FUND II, L.P. conducted business in the state of Illinois.

121. At all relevant times Defendant ERIC COPELAND was a resident of the state of California and conducted business in the state of Illinois.

122. At all relevant times Defendant C.H. RANDOLPH LYON was a resident of the state of Illinois.

123. At all relevant times Defendant STEPHAN OPPENHEIMER was a resident of the state of New York and conducted business in the state of Illinois.

124. At all relevant times Defendant KEITH BANK was a resident of the state of Illinois.

125. At all relevant times Defendant CHARLES WALKER was a resident of the state of Illinois.

126. At all relevant times Defendant VENTURE LAW GROUP conducted business in the state of Illinois.

127. Defendant Cadant, Inc. ("Cadant" or the "Company") is a Maryland corporation. At all relevant times, defendant CADANT, INC. conducted business in the state of Illinois.

128. At all relevant times Defendants VENROCK ASSOCIATES, VENROCK ASSOCIATES II, L.P., VENROCK ENTRPRENEURS FUND, L.P. HAMBRECHT AND QUIST CALIFORNIA, H&Q EMPLOYEE VENTURE FUND 2000, L.P., ACCESS TECHNOLOGY PARTNERS II, L.P., ACCESS TECHNOLOGY PARTNERS BROKERS FUND, L.P., H&Q CADANT INVESTORS, L.P., CHASE EQUITY ASSOCIATES, L.L.C., J.P. MORGAN PARTNERS, LLC, KB PARTNERS VENTURE FUND II, L.P., and KB PARTNERS AFFILIATES FUND II, L.P. provided financing to Cadant, Inc. in Lisle, Illinois.

129. Defendants ERIC COPELAND, C.H. RANDOLPH LYON, STEPHAN OPPENHEIMER, KEITH BANK, and CHARLES WALKER were members of the Board of Directors of Cadant, Inc.

130. Defendant VENTURE LAW GROUP was the general counsel to Cadant, Inc.

131. At all relevant times, defendant Cadant's corporate offices and principal place of business was located in Lisle, Illinois, within the Northern District of Illinois, Eastern Division.

## JURISDICTION AND VENUE

132. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 inasmuch as this action raises one or more federal questions under the anti-fraud provisions of the Securities Exchange Act of 1934 (15 U.S.C. 78a, et seq.) and principles of pendant jurisdiction.

133. Venue is proper in this Court inasmuch as the acts omissions or other events giving rise to this action occurred in the Northern District of Illinois, the defendants transacted business in the Northern District of Illinois, certain defendants reside in the Northern District of Illinois and Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. 78aa) provides for jurisdiction in the U.S. district court where a plaintiff resides or has its principle place of business.

## FACTS

134. Cadant, Inc. ("Cadant") was incorporated in May, 1998 as a Maryland corporation pursuant to the Maryland General Corporation Law.

135. Cadant was founded by Venkata Majeti and certain other founding shareholders.

136. In May of 1998 V. Majeti acquired 4,400,000 shares of common stock of Cadant. Due to a stock split, Majeti currently owns 8,800,000 shares of common stock of Cadant.

137. During the period from May, 1998 to January, 2001 Majeti served as the Chairman and Chief Executive Officer of Cadant. From February 2001 to present Majeti served as the non-executive Chairman of the Board of Directors.

138.   In May 1998, Frederick H. Kopko, Jr. ("F. Kopko"), was a founder and was issued shares of common stock in Cadant.   Due to stock splits, reallocations and certain sales and purchases, F. Kopko currently owns 1,422,224 shares of common stock in Cadant.

139.   Cadant's purpose was to design, develop and market cable data system products, with an initial focus on a next generation cable modem termination system ("CMTS").

140.   The initial Board of Directors of Cadant consisted of V. Majeti, F. Kopko, Edward M. Kopko ("E. Kopko") and Rimas Buinevicius ("R. Buinevicius").

141.   To fund start-up expenses, beginning on January 18, 1999 Cadant offered to sell shares of common stock at a price of $5.00 per share (the "Initial Private Placement").  Due to two subsequent stock splits, the effective per share price for the investors in the Initial Private Placement was $1.00 per share.

142.   Cadant's principal competition in the design of the next generation CMTS were initially other start-ups, Broadband Access Systems ("BAS"), River Delta Networks, and Pacific Broadband.

143.   In connection with the Initial Private Placement the Company prepared a private placement memorandum dated January 18, 1999 (the "January 18, 1999 PPM"), a copy of which is attached as Exhibit A.

144.   Pursuant to the Initial Private Placement Cadant issued approximately 1,658,313 shares of common stock (equivalent to 3,316,626 shares, on a split-adjusted basis) to approximately 85 investors raising total proceeds of approximately $3,316,626, prior to expenses related to the offering.

145.    The following Plaintiffs invested funds in Cadant in the Initial Private Placement (all share figures take into account the subsequent stock splits) between April and September 1999.

| Name | No. of Shares | Amount Invested |
|------|---------------|-----------------|
| John P. Kennedy | 40,000 | $40,000 |
| John Phillip and Virginia F. Hinderaker | 15,000 | $15,000 |
| David Walsh | 15,000 | $15,000 |
| Robert Whitney | 20,000 | $20,000 |
| Frank R. Shibilski | 25,000 | $25,000 |
| John Feith | 25,000 | $25,000 |
| David and Sandra Bruck | 25,000 | $25,000 |
| Hertner Associates, Inc. Defined Benefit Plan | 30,000 | $30,000 |
| Yale N. Kaplan Trust | 20,000 | $20,000 |
| Charles M. Stern Trust | 20,000 | $20,000 |
| StoneRidge Partners, LLC | 100,000 | $100,000 |
| Randy Grewall[1] | 124,000 | $124,000 |
| Richard Newell | 80,000 | $80,000 |
| Mario Giacone, Jr. | 50,000 | $50,000 |
| Eric Kaplan | 10,000 | $10,000 |
| Talia Greenfield[2] | 160,000 | $160,000 |
| Amanda Greenfield[2] | 160,000 | $160,000 |
| Michelle Greenfield[2] | 160,000 | $160,000 |
| Asher Greenfield[2] | 160,000 | $160,000 |
| Ian Greenfield[2] | 160,000 | $160,000 |
| Michael A. Barclay[2] | 100,000 | $100,000 |
| Nikhil Nagaswami | 40,000 | $40,000 |
| Sandy Sundram, M.D. | 100,000 | $100,000 |
| Timothy J. McKay[3] | 13,361 | $16,000 |
| Gnanesh Coomarswamy | 5,000 | $5,000 |
| Ian Elfenbaum | 10,000 | $10,000 |
| Sal Pulitano | 50,000 | $50,000 |
| Edward J. Weiner | 10,000 | $10,000 |
| Albert Weiner | 11,000 | $11,000 |
| Ruth Siegel | 1,000 | $1,000 |
| Flor Weiner | 20,000 | $20,000 |
| Howard and Diane Shachter | 10,000 | $10,000 |
| James R. Stern and | 20,000 | $20,000 |

[1] Includes 100,000 shares purchased through Stephen B. Schneer, LLC.
[2] Acquired through Stephen B. Schneer, LLC.
[3] Includes 3,361 shares purchased for $6,000 in December 2000.

| | | |
|---|---|---|
| Randi K. Stern | | |
| John N. Stern | 20,000 | $20,000 |
| Dot Chin | 5,000 | $5,000 |
| Carolyn R. Wolfe | 3,000 | $3,000 |
| Matthew P. Levine | 25,000 | $25,000 |
| Alan R. Hirsch, M.D. | 5,000 | $5,000 |
| Thomas P. Valenti | 10,000 | $10,000 |
| Jill Moore | 2,000 | $2,000 |
| Vladimir Marinkovich | 10,000 | $10,000 |
| Antoine Wakim | 10,000 | $10,000 |
| Paul E. Wakim | 10,000 | $10,000 |
| Sofija Ostojic | 15,000 | $15,000 |
| Daniel R. Pucci | 5,000 | $5,000 |
| Randall B. Haberman | 5,000 | $5,000 |
| Richard Sciortino | 15,000 | $15,000 |
| Deanne DeGraff | 5,000 | $5,000 |
| Thomas J. and Lisa K. Witt | 10,000 | $10,000 |
| Joel Haberman | 5,000 | $5,000 |
| Nicole Debortolo | 1,500 | $1,500 |
| Daniel R. Martin | 15,000 | $15,000 |
| Mira Djordjic | 10,000 | $10,000 |
| Jeffrey R. Wescott | 7,500 | $7,500 |

146.  In addition to the capital raised pursuant to the Initial Private Placement, Cadant received a $2,000,000 line of credit from Butler International, Inc.

147.  As set forth in the January 18, 1999 PPM and represented to the common stockholders of Cadant, the Articles of Incorporation and the Bylaws of the Company contain "provisions [that] are intended to enhance the likelihood of continuity and stability in the composition of the Board of Directors of the Company and in the policies formulated by the Board of Directors and to discourage certain types of transactions which may involve an actual or threatened change of control of the Company". See January 18, 1999 PPM, p. 19.

148.  The policy and expectation of the Board of Directors was to sell the Company to another telecommunications equipment manufacturer or conduct an initial public offering of its common stock (the "Exit Strategy"). The target valuation for exit was $175 million.

149.   Beginning on or about October 1999, V. Majeti initiated discussions with GunnAllen Financial, Inc. ("GunnAllen") concerning their interest in providing additional capital to Cadant through an offering of Cadant common stock. In connection with such discussions, V. Majeti provided GunnAllen with the Cadant business plan and reiterated the Exit Strategy.

150.   In or about November 1999, Cadant engaged GunnAllen to use its best efforts to sell 333,333 shares of common stock to investors at $6.00 per share.

151.   GunnAllen offered shares of common stock pursuant to a private placement memorandum dated November 22, 1999 (the "GunnAllen PPM"), a copy of which is attached as Exhibit B.

152.   The intended use of proceeds from the GunnAllen offering was to develop the CMTS and, inter alia, marketing, customer relations and business development in order that Cadant could successfully accomplish its Exit Strategy.

153.   The GunnAllen PPM provided for price protection to common stockholders such that if Cadant at any time until the earlier of (i) the date of an initial public offering, or (ii) November 9, 2001, issued common stock of Cadant at less than $6.00 per share (excluding common stock issued upon the exercise of options or warrants, or upon the conversion of convertible securities), after adjusting for stock dividends and stock splits, the investors would receive additional stock as compensation for the reduction in value of their existing holdings in Cadant.

154.   The GunnAllen PPM provided that "[t]he Company will furnish holders of shares with annual and quarterly reports containing unaudited financial information". See GunnAllen PPM, p. 44.

155. The GunnAllen PPM further provided that "[a]s long as any investor continues to hold their shares of common stock, the Company shall deliver (i) quarterly internally prepared financial statements and (ii) annual audited financial statements. These provisions shall terminate upon an underwritten public offering". See GunnAllen PPM, p. 45.

156. In or about November 1999, GunnAllen received warrants to purchase 60,000 shares of Cadant common stock at $1.785 per share, on an adjusted basis.

157. The GunnAllen Offering was completed on about January 31, 2000.

158. Despite requests from GunnAllen to supply them with financial information and other general information regarding strategy, status of the engineering team, and product development, Cadant provided no information to GunnAllen or the common stockholders.

159. Due to a stock price adjustment which occurred prior to the completion of the GunnAllen Offering, along with a subsequent stock split, the effective price per share to the investors in that offering became $1.785.

160. Pursuant to the GunnAllen Offering approximately 1,120,448 shares of common stock were sold, on an adjusted and post-split basis, contributing total additional proceeds to the Company of $2,000,000 less the costs of the offering.

161. The following Plaintiffs invested funds in Cadant in the GunnAllen Offering, with the number of shares set forth on an adjusted and post-split basis:

| Name | No. of Shares | Amount Invested |
|---|---|---|
| Estate of Donald H. Broudy | 33,614 | $60,000 |
| Joel E. Cohen | 53,782 | $96,000 |
| Estate of Adam J. Rice | 25,210 | $45,000 |
| James N. Day | 50,420 | $90,000 |
| Alvin B. Galuten | 50,420 | $90,000 |
| Bruce E. Mates Revocable | 56,024 | $100,000 |

| | | |
|---|---|---|
| Trust, dated July 24, 1996 | | |
| Gordon and Judy Evans | 12,605 | $45,000 |
| Jesse Greenfield I.R.A. | 140,056 | $250,000 |
| Greenfield Children's Partnership | 140,056 | $250,000 |
| Ejada Limited Partnership | 50,420 | $90,000 |
| Alexis J. and Deborah V. Rivera | 6,722 | $12,000 |
| Robert K. Savage | 6,722 | $12,000 |
| J. Felix and Joyce Campos | 72,834 | $130,000 |
| Charles and Karen Watterson | 50,420 | $90,000 |
| Robert Gilman | 25,210 | $45,000 |
| Gerardo A. Acosta | 50,420 | $90,000 |
| Billie D. Ennis | 25,210 | $45,000 |
| Kathryn M. Ennis | 25,210 | $45,000 |
| Michael and Mary Moses | 25,210 | $45,000 |
| Stephen M. Brown | 56,020 | $100,000 |
| Scott N. Flanders | 100,840 | $180,000 |
| Kenneth J. Ackerman | 50,420 | $90,000 |

162. In addition to the funds raised through the Initial Private Placement and the GunnAllen Offering, an additional $1,644,678 was raised through the sale of common stock between November 23, 1999 and December 29, 1999. These funds were raised pursuant to a private placement memorandum dated November 24, 1999 (the "November 24, 1999 Private Placement Memorandum"), attached as Exhibit C.. The purchase price in this offering was $6.00 per share. Due to a stock price adjustment and a subsequent stock split, the effective price to investors in that offering was also $1.785.

163. The following Plaintiffs invested funds in Cadant pursuant to the November 24, 1999 Private Placement Memorandum (all share figures take account of the subsequent stock split):

| Name | No. of Shares | Amount Invested |
|---|---|---|
| Maura Ann McBreen | 112,045 | $200,000 |
| Thomas J. Bradley | 16,807 | $30,000 |
| Paul J. McBreen | 168,067 | $300,000 |
| Annie K. Strobl | 5,602 | $10,000 |

| | | |
|---|---|---|
| Siobhan McBreen-Burke | 56,022 | $100,000 |
| Deirdre F. McBreen | 23,529 | $42,000 |
| Douglas M. Miller | 14,006 | $25,000 |
| Nick Nachich | 6,723 | $12,000 |
| Bosco Momich and Simeona Momich | 28,011 | $50,000 |
| Edward Miller | 56,023 | $100,000 |
| Jasna Sreckovic | 5,770 | $10,300 |
| Dragisa and Gordana Mirjanich | 6,400 | $11,424 |
| George Sreckovic | 13,444 | $23,998 |
| Vukasin Pavlovic | 6,400 | $11,424 |
| Miroslav Jaksic | 24,010 | $24,858 |

In addition, Hugh G. McBreen purchased 20,000 shares on September 30, 1999 for $20,000. Hugh G. McBreen also received, on November 17, 1999 a re-allocation of 76,000 shares of common stock received by another founder and on November 24, 1999 purchased 174,790 shares for $312,000. McBreen currently holds 270,790 shares in Cadant (all share figures take into account the subsequent stock splits).

164. Certain of the Plaintiffs referenced in the foregoing paragraph had extensive discussions with V. Majeti prior to their investment and relied upon his reiteration of the business plan and Exit Strategy.

165. The November 24, 1999 Private Placement Memorandum contained similar representations similar to those contained in the GunnAllen PPM regarding continuity and protections against change in control.

166. Common stockholders who subscribed for shares of common stock in the Initial Private Placement, the GunnAllen Offering and pursuant to the November 24, 1999 PPM signed the same subscription agreement, a copy of which is attached as Exhibit D.

167. Venrock Associates is, on information and belief, a general partnership. On or about January 21, 2000 Venrock Associates along with Venrock Associates II, L.P., Venrock

Entrepreneurs Fund, L.P., Hambrecht and Quist California, H&Q Employee Venture Fund 2000, L.P., Access Technology Partners, L.P., Access Technology Partners Brokers Fund, L.P., H&Q Cadant Investors, L.P. and Chase Equity Associates, L.L.C. (collectively and individually including their respective partners, officers, directors, agents and controlling persons referred to herein as "Venrock Affiliate(s)"), invested approximately $12,400,000 for approximately 6,900,000 shares of Series A Preferred Stock of Cadant, pursuant to a certain purchase agreement between Cadant, Inc., Majeti and the Venrock Affiliates (the "Venrock Purchase Agreement") dated January 21, 2000. Attached as Exhibit E is on information and belief the final draft of such agreement and reflects the full intent and meaning of the executed Purchase Agreement fully executed in connection with the Series A investment (the investment pursuant to the Venrock Purchase Agreement is referred to as the "Initial Venrock Investment").

168.    In connection with the Initial Venrock Investment, V. Majeti and other employees of Cadant met on several occasions with partners of Venrock, including Eric Copeland ("E. Copeland").

169.    Pursuant to the Venrock Purchase Agreement and in connection with Cadant's issuance of preferred stock pursuant thereto to the Venrock Affiliates, Cadant represented and warranted that no director entered into any transaction with Cadant, including any contract or agreement requiring payments to an affiliate of any such director (the "Affiliate Transaction Prohibition").

170.    The Affiliate Transaction Prohibition contained in the Venrock Purchase Agreement expressly provides:

        SECTION 2.18    <u>Transactions With Affiliates</u>.    No director, officer, employee or stockholder of the Company, or member of the family of any such

person, or any corporation, partnership, trust or other entity in which any such person, or any member of the family of any such person, has a substantial interest or is an officer, director, trustee, partner or holder of more than 5% of the outstanding capital stock thereof, is a party to any transaction with the Company, including any contract, agreement or other arrangement providing for the employment of, furnishing of services by, rental of real or personal property from or otherwise requiring payments to any such person or firm, other than employment-at-will arrangements in the ordinary course of business.

171. Pursuant to Section 7.02 of the Venrock Purchase Agreement the Affiliate Transaction Prohibition survived the closing and was in full force and effect during the relevant time period referenced herein.

172. The Affiliate Transaction Prohibition prohibited self-dealing financing transactions.

173. In approving the Venrock Purchase Agreement, the Cadant Board of Directors relied upon Venrock Affiliates acting in good faith and not engaging in self-dealing transactions.

174. Prior to the Initial Venrock Investment, on January 5, 2000 certain directors of Cadant met certain Venrock Partners at the Rockefeller Center in New York City, New York. E. Copeland attended the meeting by teleconference. At the meeting, V. Majeti made a presentation of Cadant's business plan, including the Exit Strategy. Cadant directors informed Venrock of the Cadant common stockholders' expectations. Venrock represented that they would provide not only the initial capital of their investment, but should be viewed as providing much more to the future success of Cadant through industry contacts, financial credibility, management expertise, technology insight and market expertise both in technology and finance.

175. Venrock represented to Cadant that its goal in investing in Cadant was to create long term value which would benefit Cadant common stockholders.

176. Venrock required and received full and complete information regarding the amount of shares of common stock previously issued to investors. Venrock was fully aware of the number of common stockholders in Cadant, the amount of funds invested by such common stockholders and the disclosure provided to such common stockholders.

177. Venrock drafted all investment documentation related to its investment in Cadant including the Venrock Purchase Agreement, Investors Rights Agreement, Stock Restriction Agreement, Observer Rights Agreement and other ancillary document (the "Venrock Initial Investment Financial Documents").

178. In connection with the Initial Venrock Investment and as a first step in taking control over the future of Cadant, Venrock required that R. Buinevicius and E. Kopko resign as members of the Board of Directors to be replaced by E. Copeland and Mark Rochkind.

179. M. Rochkind was an investor in the Initial Venrock Investment.

180. In connection with the Initial Venrock Investment, Venrock also required observation rights for another Venrock Affiliate. Such observation rights were exercised by Charles Walker ("C. Walker") of Access Technology Partners ("Access"), who had one of his employees at Access, Christopher Montano, attend the Cadant Board of Director meetings.

181. In connection with the Initial Venrock Investment, in furtherance of their plan to control Cadant, Venrock required V. Majeti to enter into a stock restriction agreement. Pursuant to the stock restriction agreement, Venrock in effect took away 4,000,000 shares of common stock that V. Majeti owned, and allowed such shares to vest ratably over a 24 month period if V. Majeti was not terminated by the Board of Directors of Cadant.

182.   Concurrent with Venrock Affiliates' decision to invest, the Venture Law Group (the "Venture Group Lawyers") became outside counsel to Cadant.

183.   The Venture Group Lawyers purported to represent Cadant, and therefore the common stockholders, in connection with the Initial Venrock Investment.

184.   The Venture Group Lawyers never advised the Cadant Board of Directors on the legal implications of the Venrock Investment Financial Documents, including but not limited to the V. Majeti stock restriction agreement.

185.   On information and belief, the Venture Group Lawyers had a conflict of interest in the prior representation of clients where Venrock Affiliates had a substantial financial interest.

186.   The Venture Group Lawyers invested in the Initial Venrock Investment but never disclosed their intention to invest to the Board of Directors of Cadant prior to the Initial Venrock Investment.

187.   The Venture Group Lawyers never disclosed any conflict of interest to the Board of Directors of Cadant prior to the Initial Venrock Investment.

188.   The Venture Group Lawyers worked with the Venrock Affiliates in connection with the Venrock Affiliates plan to control the financial and business affairs of Cadant for their own profit and loss to Cadant common stockholders.

189.   On or about April 2000, based on the then current rate of spending, Cadant would be out of cash within twelve months.

190.   At the meeting of the Cadant Board of Directors on April 12, 2000, the Cadant Board of Directors was advised that at the then current rate of spending with a staff of approximately 75 employees Cadant would be insolvent in approximately twelve months.

191. At the meeting of the Cadant Board of Directors on April 12, 2000, V. Majeti distributed a letter from David Russell, Director of Business Development of ADC Telecommunications, which was prepared specifically for the consideration of the Board of Directors at its April 12th meeting (the "ADC Offer Letter"), a copy of which is attached as Exhibit F.

192. The ADC Offer Letter was prepared with the view of an "outright acquisition of Cadant". As stated by ADC, ADC's intent after discussions between the two companies was that its "offer to Cadant would be in the $300 million range", representing a price per share of approximately $13.00, adjusted for the 2-for-1 Cadant stock split.

193. At the April 12th meeting of the Cadant Board of Directors, the members of the Board of Directors devoted less than five minutes discussing the terms of the ADC Offer Letter, dismissing the offer as being inadequate in terms of indicated value.

194. At the April 12th meeting of the Cadant Board of Directors, the Cadant Board of Directors undertook no analysis, did not seek outside advice with respect to fair value, had no alternative plans developed and did nothing to fulfill their fiduciary duty of care to consider the offer.

195. The April 12, 2000 Cadant Board of Directors meeting minutes reflect no mention of the ADC Offer Letter nor any care exercised by the Cadant Board of Directors in considering the offer. The minutes of the meeting of the Cadant Board of Directors for April 12, 2000 are attached as Exhibit G.

196. Certain member(s) of the Cadant Board of Directors made repeated attempts to convince E. Copeland and V. Majeti to consider and negotiate in good faith a transaction with ADC.

197.  The Cadant Board of Directors did nothing to obtain and act with due care on all material information reasonably available to achieve the best value for the common stockholders. In a letter from the Chairman of the Board of Cadant to ADC, Mr. Majeti admits that the Board of Directors did not exercise its duty of care and failed to be diligent and vigilant in examining the transaction at the April 12th meeting stating "[o]ur board members or the management team have not discussed merger/acquisition opportunities, value proposition or conditions for such an action". See Venkata Majeti letter to David Russell attached as Exhibit H.

198.  As a result of the continued failure of the Board of Directors to consider and act on the ADC Offer Letter in good faith, on July 10, 2000 a memorandum was sent by F. Kopko to all the Cadant Board of Directors stating:

"It should also be understood that the Board of Directors are authorized representatives of the shareholders and they owe several duties to the shareholders. Among the fiduciary duties owed, are the obligations to:

(a)  be diligent and vigilant in examining critically all significant transactions and offers;

(b)  act in good faith;

(c)  obtain and act with due care on all material information reasonably available to compare offers and determine alternatives which provide the best value for the company/shareholders; and

(d)  negotiate actively and in good faith with potential buyers to that end.

The outlined duties were taken from a reported case: Paramount Communications v. QVC Network, 637 A.2d 34 (1993).

As you will note, no reference at all was made in any of the Minutes to the April 11 letter from ADC. From the minutes one could conclude we gave no thought at all to the letter and that we failed in fulfilling our duties to the shareholders."

A copy of the memorandum to the Cadant Board of Directors is attached as Exhibit I.

199.   Following receipt of the ADC Offer Letter, V. Majeti informed F. Kopko that he and E. Copeland would prefer that F. Kopko resign from the Board of Directors of Cadant.

200.   During the summer of 2000, F. Kopko refused to resign from the Board of Directors of Cadant.

201.   The ADC Offer Letter also proposed that if an outright acquisition were not possible, a joint venture to provide necessary financing was open to discussion.

202.   After Cadant's refusal to enter into good-faith negotiations to be acquired by ADC, ADC initiated discussions with BAS, another CMTS development start-up. Discussions culminated in the acquisition of BAS by ADC in November 2000 for approximately $2.2 billion.

203.   At or about the time of the ADC Offer Letter, Venrock approved and participated in the preparation of a press release by Cadant representing that Venrock maintained "a tradition of collaboration with talented entrepreneurs to establish successful, enduring companies". The "Venrock Press Release" is attached as Exhibit J.

204.   After refusing to negotiate with ADC in good faith, rather than take steps to raise the necessary capital in a financing fair to common stockholders to establish a successful and enduring company, Cadant accelerated its spending and significantly depleted its cash to the point where by August 31, 2000, Cadant had only $6.2 million of cash and had increased the monthly spending rate to approximately $2.0 million.

205.   Neither at the time nor after it failed to negotiate with ADC did the Cadant Board of Directors take any steps to initiate an initial public offering of its common stock that,

under then existing market conditions, would have benefited the Cadant common stockholders and establish Cadant as a successful and enduring company.

206. Neither at the time nor after it failed to negotiate with ADC did the Cadant Board of Directors cause the Company to prepare a registration statement to register shares of its common stock to be filed with the Securities and Exchange Commission in order that it could conduct such an offering at a valuation consistent with the ADC Offer Letter for the benefit of Cadant common stockholders and to raise the necessary capital to establish Cadant as a successful and enduring company.

207. Neither at the time nor after it failed to negotiate with ADC did the Cadant Board of Directors cause the Company to prepare a private placement memorandum to offer common stock at a valuation consistent with the ADC Offer Letter for the benefit of Cadant common stockholders and to raise the necessary capital to establish Cadant as a successful and enduring company.

208. Venrock Affiliates, through E. Copeland, misled the disinterested members of the Board of Directors to believe that Venrock Affiliates would work to procure financing that would be fair to common stockholders and to establish Cadant as a successful and enduring company when Venrock Affiliates' true intention was to maximize its own gain through planned subsequent self-dealing financings that would subject the Cadant common stockholders to undue risk.

209. During the summer of 2000, Venrock Affiliates caused Cadant to pursue only unfair, unreasonably dilutive, self-dealing financing that would be unfair to Cadant common stockholders.

210. During the summer of 2000, Venrock Affiliates caused Cadant to engage Thomas Weisel Partners ("TWP"), a merchant banking firm, on a limited basis to discuss the prospect of the sale of Cadant to Cisco Systems, Inc. ("Cisco") and Nortel Networks Corp. ("Nortel"). Nortel in collaboration with Antec Corporation ("Antec") formed a joint venture called Arris Interactive LLC ("Arris LLC") to manufacture and develop cable telephony products and cable modem systems.

211. In the summer of 2000 Venrock Affiliates and the Cadant Board of Directors did not permit TWP to conduct a broader process to pursue a sale of Cadant which process would maximize common stockholder value.

212. In the summer of 2000, Nortel, Arris LLC, and Antec (the "Arris/Antec/Nortel Family") indicated an interest in purchasing Cadant but could not undertake and complete a transaction for an indefinite period of time due to certain planned transactions among them.

213. In the summer of 2000, Venrock Affiliates knew that a transaction could not be completed with the Arris/Antec/Nortel Family before Cadant ran out of cash.

214. In the summer of 2000, the Cadant Board of Directors did not negotiate a sale transaction with Cisco despite an interest by Cisco to negotiate the purchase of Cadant.

215. In or about September of 2000, V. Majeti continued to seek F. Kopko's resignation from the Board of Directors of Cadant and insisted that he be replaced by R. Lyon, a managing director of J.P. Morgan.

216. V. Majeti represented to F. Kopko that Venrock supported R. Lyon to replace F. Kopko.

217. In a telephone conference with E. Copeland, E. Copeland indicated that Venrock supported R. Lyon's appointment to the Board of Directors of Cadant, that R. Lyon

represented a good source of capital and that R. Lyon's appointment was in the best interest of Cadant.

218. V. Majeti also informed F. Kopko that if he did not resign Cadant would institute a lawsuit against F. Kopko to force his resignation.

219. On September 12, 2000, F. Kopko agreed to be replaced by C.H. Randolph Lyon as a member of the Board of Directors of Cadant.

220. On September 13, 2000 C.H. Randolph Lyon was appointed to the Board of Directors of Cadant. On that same day the Chase Manhattan Corporation ("Chase") and J.P. Morgan Incorporated announced their agreement to merge.

221. That R. Lyon had a conflict of interest in that Chase was a Venrock Affiliate in the Initial Venrock Investment was not disclosed to F. Kopko by E. Copeland, R. Lyon or any other Venrock Affiliate.

222. R. Lyon was an investor in the Initial Venrock Investment.

223. As of the September 13, 2000 Cadant Board of Directors meeting, Cadant was dangerously close to completely running out of cash, but the Board of Directors continued to authorize increases in spending based on E. Copeland's representations that with financial projections and other limited information Venrock would be ready to "step-up" with financing. As of the September 13, 2000 meeting, the employee base totalled 106 and at E. Copeland's urging plans were put in place for yet more increases through the end of the year.

224. On or about October 26, 2000, Cadant received from Apex Venture Partners, Brinson Partners, Inc. and KB Partners, LLC, a venture capital style financing proposal represented by a Term Sheet attached as Exhibit K (the "Apex Term Sheet").

225. The Apex Term Sheet provided for, inter alia,

    (i)      a pre-money valuation for Cadant of $350 million;

    (ii)     an investment of at least $40 million in Series B Convertible Preferred Stock;

    (iii)    a liquidation preference equal to three times (3x) the purchase price of the Series B Preferred plus accrued and unpaid dividends; and

    (iv)    pre-emptive rights to maintain pro-rata ownership of Cadant.

226. E. Copeland represented the Board of Directors of Cadant to negotiate the Apex Term Sheet.

227. E. Copeland did not negotiate the Apex Term Sheet in good faith.

228. Rather than accept the Apex Term Sheet, beginning on or about November 2000, Venrock Affiliates began planning a scheme for a financing directly from Venrock Affiliates for Cadant on terms much less favorable than the Apex Term Sheet or an arms-length financing from a traditional investment banking firm in the form of a private placement of common stock.

229. Venrock Affiliates planned a financing scheme that would be profitable to themselves at the expense of Cadant common stockholders.

230. In the fall of 2000, the Cadant Board of Directors did nothing to seek out arms-length fair financing alternatives that were not detrimental to Cadant common stockholders due to repeated assurances by E. Copeland of Venrock Affiliates' commitment to plan the financing needs of Cadant in the best interest of Cadant common stockholders.

231. At October 31, 2000, the Cadant Board of Directors were advised that as a result of procuring equipment financing from Comdisco, Inc., the cash position of Cadant was

approximately $6.2 million, and the average monthly cash spending rate had increased to approximately $2.2 million. The Cadant Board of Directors was fully aware that Cadant would be insolvent by January of 2001.

232.    In November 2000, the Venrock controlled Board of Directors of Cadant solicited proxies pursuant to a Proxy Statement dated November 10, 2000 (the "Proxy Statement"). (Attached as Exhibit L).

233.    The Proxy Statement was prepared for the purpose of soliciting proxies from Cadant common stockholders on behalf of the Board of Directors of Cadant.

234.    The proxies were to be used at the Cadant Annual Meeting of Stockholders to be held on Saturday, December 2, 2000 at 1:00 p.m. at 3003 Corporate West Drive, Lisle, Illinois.

235.    The Proxy Statement was prepared by Venture Group Lawyers and solicited votes for (i) the election of directors; (ii) appointment of independent auditors; (iii) approval of a stock plan and stock option plan; (iv) approval of the two-for-one split of the Company's Series A Convertible Preferred Stock and adoption of the Amended and Restated Articles Supplementary to the Articles of Incorporation; and (v) reincorporation of the Company from Maryland to Delaware.

236.    As of November 10, 2000, the date of the Proxy Statement, Cadant had 228 common stockholders of record, including both accredited, unaccredited, sophisticated and unsophisticated within the meaning of the Regulation D promulgated under the Securities Act of 1933.

237.    R. Lyon was nominated to the Board of Directors for election by the holders of record of Series A Convertible Preferred Stock and Common Stock.

238. The Proxy Statement provided no information on the background of or conflicts of interest involving R. Lyon and his relationship with the Venrock Affiliates.

239. The Proxy Statement provided no information on the background of or conflicts of interest of any member of the Cadant Board of Directors.

240. The Proxy Statement purported to instruct common stockholders on the status of Delaware law, Maryland law and Cadant's Articles of Incorporation and By-laws.

241. The Proxy Statement was not an accurate and complete statement of the law or the implications of elimination of Cadant's Articles of Incorporation and By-laws then effective, as filed with the Maryland State Department of Assessments and Taxations.

242. The Proxy Statement omitted the true reasons for reincorporation, which was principally to substantially reduce the voting power of Cadant common stockholders, but rather expressly enumerated the "Principal Reasons for Reincorporation" as:

> (i) Prominence, Predictability, and Flexibility of Delaware Law;
>
> (ii) Increased Ability to Attract and Retain Qualified Directors; and
>
> (iii) Anti-Takeover Implications.

243. The Proxy Statement contained no disclosure regarding the super-voting majority provisions under Cadant's Maryland Articles of Incorporation and By-laws.

244. The Proxy Statement omitted to disclose the danger to Cadant common stockholders of eliminating the then existing super-voting majority provisions under Cadant's Maryland Articles of Incorporation and By-laws.

245. It would have been material to a Cadant common stockholder to know that the proposed Cadant reincorporation would substantially reduce common stockholder voting rights.

246.    It would have been material to a Cadant common stockholder to know the proposed reincorporation would give Venrock Affiliates substantial control over the disposition of all of Cadant's assets.

247.    The Proxy Statement omitted to disclose certain material changes associated with the reincorporation of Cadant from Maryland to Delaware including but not limited to the fact that as a result of the elimination of the super-voting provision contained in the Cadant Maryland Charter and By-Laws, and, consequently that under the proposed Delaware reincorporation, the Venrock Affiliates would more likely be able to control the transfer of Cadant's business without common stockholder consent or knowledge.

248.    Prior to the solicitation of such proxies pursuant to the Proxy Statement, the Venture Group Lawyers advised the disinterested Board of Directors that reincorporation in Delaware was more desirable from a common stockholder standpoint.

249.    The Venture Group Lawyers knew but failed to advise the disinterested Board of Directors that the reincorporation in Delaware could be a very dangerous device to the Cadant common stockholders.

250.    The Venture Group Lawyers knew or should have known that the Proxy Statement was fraudulent and misleading.

251.    The results of the proxy solicitation were never disclosed to Cadant common stockholders.

252.    The Proxy Statement omitted to disclose any financial information concerning Cadant and provided no disclosure regarding the imminent threat of Cadant running out of money because the Board of Directors had failed to exercise reasonable care with respect to the financial affairs of Cadant.

253.   The Proxy Statement omitted to disclose the planned financing scheme of Venrock Affiliates.

254.   On information and belief, as of the date of the proxy solicitation, the Board of Directors was fully aware of the fact that Cadant would have no cash available for operations by the middle of January 2001.

255.   At the Annual Meeting of Stockholders none of the Venrock Affiliate Directors were present to answer questions from Cadant common stockholders except V. Majeti, who conducted the meeting.

256.   No communication of any kind was disclosed to Cadant common stockholders concerning the financial condition of Cadant prior to or in connection with the proxy solicitation.

257.   In or about January 2001, Cadant had no cash available to run its operations and was insolvent in that it could no longer meet its obligations as they became due.

258.   On January 10, 2001 the Venrock Affiliates caused C. Walker, a principal of a Venrock Affiliate, to be appointed to the Board of Directors of Cadant.

259.   C. Walker, at the time of his appointment to the Cadant Board of Directors was a partner of J.P. Morgan Partners with oversight for Chase H&Q Capital Partners II, L.P., a Venrock Affiliate in the Initial Venrock Investment. Chase H&Q Capital Partners II, L.P. was the successor to Access Technology Partners, L.P., the original investor with Venrock in the Initial Venrock Investment.

260.   On or about January 12, 2001, the Cadant Board of Directors was controlled by Venrock Affiliates, consisting of E. Copeland, R. Lyon, C. Walker, M. Rochkind, V. Majeti and J. Vohra.

261. C. Walker, despite his conflict of interest, in January 2001 negotiated the terms of an oppressive and unfair short term financing to Cadant by Venrock Affiliates (the "First Venrock Bridge").

262. The First Venrock Bridge did not involve arms-length bargaining between Cadant and the Venrock Affiliates.

263. The terms of the First Venrock Bridge were a result of the unilateral determination of the Venrock Affiliates.

264. There were no procedural safeguards instituted or in place during the period that the terms of the First Venrock Bridge were unilaterally determined by the Venrock Affiliates to protect the interest of the Cadant common stockholders.

265. In or around January 2001, Venrock Affiliates, in furtherance of their scheme to benefit themselves at the expense of Cadant common stockholders, caused financing documents to be prepared in connection with the First Venrock Bridge which would give the Venrock Affiliates yet ever more control over the affairs and assets of Cadant.

266. Pursuant to the Convertible Bridge Loan Agreement dated February 1, 2001, J.P. Morgan Partners, LLC acted as agent for the lenders (together with each of their successors and assigns). C. Walker at the time of execution of the Convertible Bridge Loan Agreement was both a Partner of J.P. Morgan Partners and a director of Cadant. The lenders in the First Venrock Bridge included Venrock Entrepreneurs Fund, L.P., Venrock Associates and Venrock Associates II, L.P.

267. When Cadant became insolvent, Venrock Affiliates caused Cadant to agree to a short term lending facility arranged by Venrock Affiliates and negotiated by C. Walker.

268. The First Venrock Bridge Convertible Secured Bridge Loan Agreement (attached as Exhibit M) provided for, inter alia:

    (i)    a 90 day repayment date;

    (ii)    execution of a Security Agreement, Patent Security Agreement and Trademark Security Agreement pursuant to which Venrock would obtain a first priority security interest in all of the Company's assets subject only to certain permitted liens;

    (iii)    Venrock with the ability to convert any outstanding balance under the First Venrock Bridge into securities issued and sold in a financing acceptable to Venrock;

    (iv)    Venrock had the sole right to determine future financings of the Company;

    (v)    Venrock received the voting rights associated with the common stock owned by V. Majeti;

    (vi)    Venrock Affiliates required yet another Venrock controlled person be added to the Cadant Board of Directors through a designation right granted to J.P. Morgan.

269. Venrock Affiliate lenders, in addition to interest payments, required a 50% profit or preference payment on the amount originally loaned to Cadant in the event of a sale of Cadant before any payments to Cadant common stockholders.

270. Venrock Affiliate lenders, in addition to interest, preference payments and conversion rights, also received warrants to purchase 2,750,000 shares of Cadant common stock at $1.00 per share, a price which represented a fraction of Cadant's value contained in the

ADC Offer Letter, the Apex Term Sheet, or other indications of value from independent third parties.

271.    Venrock Affiliates knew that with a reincorporation in Delaware, where all classes of capital stock vote together, coupled with their requirement that V. Majeti's common stock be voted with the Venrock Affiliates, the Venrock Affiliates could now control the disposition of all Cadant assets.

272.    On or about February 1, 2001, the Venrock Affiliates, in furtherance of their financing scheme to benefit themselves at the expense of common stockholders, loaned $11,000,000 to Cadant on terms and conditions set forth in the Convertible Secured Promissory Note and the Convertible Bridge Loan Agreement. The Convertible Secured Promissory Note and the Convertible Bridge Loan Agreement are attached as Exhibits N and O.

273.    On February 1, 2001, E. Copeland, R. Lyon, C. Walker and M. Rochkind were self-interested directors with respect to the First Venrock Bridge.

274.    On February 1, 2001 the disinterested directors were not fully informed as to all material facts related to the First Venrock Bridge or the Venrock Affiliates' financing scheme to benefit themselves at the expense of Cadant common stockholders, and the disinterested directors were unable to make an informed and deliberate judgment, but rather made a judgment based upon economic oppression.

275.    Venrock Affiliate self-interested Cadant directors timed and structured the First Venrock Bridge so as to enable them to force a transaction involving the disposition of Cadant's assets irrespective of an adverse impact on Cadant common stockholders.

276.    On February 1, 2001 Venrock Affiliates caused Stephan Oppenheimer, a Principal of J.P. Morgan (yet another Venrock Affiliate) to be appointed to the Board of Directors of Cadant.

277.    During the period of negotiating and instituting the First Venrock Bridge, the Venrock Affiliates through their participation on the Board of Directors had a fiduciary duty to Cadant common stockholders to act in their best interest and cause Cadant to take actions that were believed to be in the best interest of Cadant common stockholders.

278.    Venrock Affiliates knew and the Board of Directors knew that the First Venrock Bridge would have negative consequences to Cadant and the Cadant common stockholders because the debt would severely limit Cadant's ability to obtain additional financing and would place Cadant at a competitive disadvantage.

279.    During the period of negotiating and instituting the First Venrock Bridge, E. Copeland, as a member of the Board of Directors of Cadant, did not act in the best interest of Cadant common stockholders, but rather acted in a manner to best benefit Venrock Affiliates and in furtherance of that intention directed Cadant toward being placed in dire financial circumstances such that the other Cadant Board of Directors had no alternative but to accept unfair terms and conditions of self-dealing financing planned by Venrock Affiliates to be presented at a point in time when Cadant would be completely out of cash.

280.    In connection with the First Venrock Bridge, E. Copeland, C. Walker and R. Lyon acted with a reckless disregard of the interests of Cadant common stockholders.

281.    The Board of Directors of Cadant, including the Venrock Affiliate Board of Director members, were fully aware of exactly when Cadant would no longer have sufficient cash

to run its operations as a result of their receipt of a Cash Status and Outlook Report at regularly held board of director meetings. Such report included specific information with respect to cash in bank, actual monthly cash burn and monthly average cash burn rate for the remainder of the year.

282. On February 1, 2001, Venrock Affiliates caused the removal of V. Majeti as Chief Executive Officer.

283. Venrock Affiliates, in connection with its loan to Cadant, required that certain Cadant common stockholders execute an Amended and Restated Investors Rights Agreement ("Investors Rights Agreement"). Kevin Johnson, the controller of Cadant, forwarded the Investors Rights Agreement to such common stockholders urging their signatures and indicating that without such agreement Venrock would not loan the desperately needed funds to keep Cadant operating and bridge it to a transaction that would benefit Cadant common stockholders. Venrock, however, did not provide full disclosure to the Cadant common stockholders who were required to sign the Investors Rights Agreement failing to disclose, among other omissions, the amount to be loaned, the liquidation preference and the identification of the lenders, the various conflicts of interest and the failure of the Cadant Board of Directors to act in the best interest of Cadant common stockholders.

284. In connection with the First Venrock Bridge, certain Cadant common stockholders signed the Amended and Restated Investors Rights Agreement dated January 21, 2001 whereby such common stockholders agreed to certain restrictions regarding their right to transfer their shares of common stock.

285.   At the time Venrock required the restriction on transfer certain Cadant common stockholders had received indications of interest from independent third parties to purchase their common stock holdings at a price of $5.00 per share.

286.   It was not until on or about March 19, 2001 that Venrock Affiliates caused Goldman, Sachs & Company to solicit funds for Cadant's operations, at a time when the First Venrock Bridge would soon be in default.

287.   Venrock Affiliates and the Board of Directors of Cadant ignored their fiduciary responsibilities to Cadant common stockholders by having Goldman, Sachs only solicit investors to lead an investment in $50 million of a Series B Convertible Preferred Stock (the "Goldman Offering"), which financing was unfair and unreasonably dilutive to the common stockholders but was designed to benefit the Venrock Affiliates.

288.   The Venture Group Lawyers prepared a Private Placement Memorandum, dated March 19, 2001 for use in the Goldman Offering. The March 19, 2001 Private Placement Memorandum is attached as Exhibit P (the "Goldman PPM").

289.   The Goldman PPM acknowledged the negative consequences of the First Venrock Bridge expressly stating that such negative consequences include, inter alia:

      (i)     "limiting our ability to obtain additional financing";

      (ii)    "limiting our flexibility in planning for, or reacting to, changes in our business and the industry in which we compete"; and

      (iii)   "placing us at a possible competitive disadvantage relative to less leveraged competitors and competitors that have better access to capital resources".

290.    The intent of the Goldman Offering was to substantially dilute Cadant common stockholders by providing for preference payments and conversion rights that would benefit Venrock Affiliates.

291.    The Venrock Affiliate Board of Directors caused Cadant only to seek common stockholder cram down financing through the Goldman Offering because the financing documents C. Walker had caused to be put in place provided that the entire principal amount plus accrued interest of the First Venrock Bridge could be converted into the same securities sold in the Goldman Offering (the "Conversion Right in the First Venrock Bridge").

292.    The Venrock Affiliate Board of Directors' affiliate entities would directly benefit from a financing pursuant to the Goldman Offering that would be grossly unfair to Cadant common stockholders.

293.    The intended terms of this dilutive financing to Cadant common stockholders were set forth in an Exhibit for the Goldman PPM entitled "Summary of Principal Terms of Series B Preferred Stock Financing of Cadant, Inc.", which is attached as Exhibit Q.

294.    The Goldman Offering term sheet provided for a 300% preference return to the venture capitalist, and therefore to the Venrock Affiliates through their Conversion Right in the First Venrock Bridge, before any money would be returned to Cadant common stockholders.

295.    At no time did the Venrock Affiliate controlled Board of Directors of Cadant provide financial information or any other information to GunnAllen, the Cadant common stockholders or any other financial institution to raise capital for Cadant in a common stockholder offering.

296. The Venrock Affiliate Board of Directors did nothing to fulfill their fiduciary duty to Cadant common stockholders, but rather only sought out financing that was detrimental to the Cadant common stockholders and highly profitable to themselves.

297. In the beginning of May 2001, V. Majeti telephoned F. Kopko to inform him that he believed Venrock was intending to take action that would substantially eliminate Cadant common stockholder value. As a result, he asked F. Kopko to meet with him at Cadant's principal offices to discuss the Venrock plan and to meet C. Walker.

298. F. Kopko met with V. Majeti as requested and discussed the events at Cadant over the past several months and possible alternatives to the Venrock plan.

299. At the May, 2001 meeting, V. Majeti introduced C. Walker to F. Kopko. At that initial introduction, C. Walker clearly stated that it was the intention of Venrock Affiliates to "squash" the Cadant common stockholders by exercising its rights with Venrock as a bridge lender. C. Walker indicated that if F. Kopko wanted to save the Cadant common stockholders he would need to provide a financing proposal within a matter of days. C. Walker represented to F. Kopko that he would serve to facilitate the process of putting forth a financing proposal that would be acceptable to the Venrock Affiliates.

300. Following the C. Walker threat in May, 2001, discussions immediately began involving Worldwide Associates, LLC ("Worldwide"), Butler International, Inc. and other Cadant common stockholders to put together emergency funding for Cadant.

301. On or about Tuesday, May 16, 2001, Worldwide and Butler prepared a Term Sheet attached as Exhibit R for emergency funding (the " Emergency Funding Proposal Term Sheet").

302.    The Emergency Funding Proposal provided for up to $14 million of additional funding from Worldwide, Butler and existing Cadant common stockholders. The Initial Emergency Funding was conditioned on Venrock giving up their threat to cram down existing Cadant common stockholders and provided for a term of one year. The term sheet required that the Initial Venrock Investment convert into common stock at the price originally agreed to in the Venrock Initial Investment Financial Documents. The term sheet also required that the First Venrock Bridge be converted into common stock at the same conversion price as the Venrock Initial Investment. Additionally, the term sheet also required that control of the Cadant Board of Directors be taken away from Venrock Affiliates and Bridge Lenders and rather be representative of the Cadant common stockholders.

303.    Venrock Affiliates would not agree with the proposed funding by the Cadant common stockholder group.

304.    Venrock Affiliates unilaterally set forth the significant and substantive terms and conditions upon which they would permit funding of Cadant operations (the "Second Venrock Bridge"). A copy of the Second Venrock Bridge is attached as Exhibit S.

305.    S. Oppenheimer, E. Copeland and K. Bank, on behalf of the Venrock Affiliates, set forth the terms and conditions under which the Venrock Bridge Lenders would permit emergency funding to be provided to Cadant and avert their immediate intention to eliminate all Cadant common stockholder value.

306.    The Second Venrock Bridge, like the First Venrock Bridge, provided for only a 90 day term, thereby leaving Cadant under the threat of Venrock foreclosing upon their purported liens and eliminating all Cadant common stockholder value.

307.    The Second Venrock Bridge also provided for a 200% liquidation preference on the entire principal amount of $9,000,000. Like the First Venrock Bridge the preference was to be paid before any payments to Cadant common stockholders, thereby again reducing the likelihood that the Cadant common stockholders would ever receive back the amount they invested even though Venrock Affiliates would receive a 100% profit.

308.    The Second Venrock Bridge gave complete power to Venrock Affiliates with respect to enforcing all decisions affecting the Second Venrock Bridge by providing that a decision to convert the short term oppressive note was the decision of a majority of the bridge lenders, which was controlled by the Venrock Affiliates.

309.    KB Partners Venture Fund II, L.P. and KB Partners Affiliates Fund II, L.P., lenders in the Second Venrock Bridge, also were lenders under the First Venrock Bridge. Keith Bank, the managing partner of KB Partners Venture Fund II, L.P. and KB Partners Affiliates Fund II, L.P., became a member of the Board of Directors of Cadant on May 31, 2001 pursuant to Venrock's demand.

310.    In connection with the Second Venrock Bridge, the Venrock Affiliates sought to obtain signature pages by certain founding Cadant common stockholders for the Amendment and Joinder Agreement to the Stock Restriction Agreement and the Amendment and Joinder Agreement to the Amended and Restated Investors Rights Agreement.

311.    As a result of the Venrock Affiliates refusal to agree to the proposed funding by the Cadant common stockholder group in May 2001, which funding was intended to be fair and equitable to the Cadant common stockholders, certain common stockholders who were requested to sign certain agreements in connection with the Second Venrock Bridge

signed such documents with the understanding that they did not agree that the Second Venrock Bridge was fair.

312.   Neither the Venrock Affiliates nor Cadant disclosed to all the Cadant common stockholders the terms and conditions of the Second Venrock Bridge nor the threat by Venrock Affiliates to "squash" common stockholders.

313.   The Venrock Affiliates never requested the consent of the Cadant common stockholders to provide self-dealing financing on terms and conditions dictated by the Venrock Affiliates.

314.   On May 31, 2001, in connection with the Second Venrock Bridge, Jay Vohra and Mark Rochkind were replaced by F. Kopko and G. Grkinich as members of the Board of Directors of Cadant.  The Board of Directors then consisted of E. Copeland, C. Walker, S. Oppenheimer, K. Bank, G. Grkinich, F. Kopko and V. Majeti.  The Venrock Affiliates maintained their control of the affairs of Cadant through their control of the Cadant Board of Directors.

315.   Cadant did not notify its common stockholders that the Board of Directors had been reconstituted on May 31, 2001.

316.   On May 31, 2001 Venrock Affiliates also required and caused the Board of Directors of Cadant to appoint C. Walker as Interim Chief Executive Officer, completing Venrock's plan of taking total control over the affairs of Cadant.

317.   The common stockholders of Cadant were not informed that C. Walker was appointed as Interim Chief Executive Officer of Cadant.

318.   Venrock also caused C. Walker to receive a lucrative employment agreement as Interim Chief Executive.  The terms and conditions of the employment agreement were the result

of discussions between E. Copeland and C. Walker. A copy of the employment agreement is attached as Exhibit T.

319. Neither the Venrock Affilaites nor Cadant disclosed to the common stockholders of Cadant the terms and conditions of the C. Walker employment agreement.

320. The disinterested members of the Board of Directors of Cadant did not approve the terms and conditions of the C. Walker employment agreement.

321. The Second Venrock Bridge was to be conditional upon the creation of a Finance Committee to find alternative financings and an Acquisition Committee to oversee the activities of the investment bank in an effort to sell Cadant.

322. The Venrock Affiliates, including C. Walker, did not adhere to the committee structure, but instead created and followed their own agenda for the benefit of only the Venrock Affiliates and to the detriment of the Cadant common stockholders.

323. The terms of the Second Venrock Bridge were drafted in a manner that, based upon C. Walker's failure to abide by an Operating Budget, caused it to be quickly in default, subjecting Cadant to an immediate foreclosure by Venrock Affiliates.

324. E. Copeland, in his effort to have Venrock Affiliates control all aspects of Cadant's business and financial affairs, provided C. Walker with a pay-off in his employment agreement to secure financing, irrespective of the negative impact of such financing on the Cadant common stockholders.

325. C. Walker's employment agreement, arranged by the Venrock Affiliates, provided for a cash payment to C. Walker whether or not the Cadant common stockholders were completely diluted.

326. As a result of Venrock's actions in putting in place the First Venrock Bridge and the Second Venrock Bridge, Cadant was placed in a forced liquidation posture, thereby eliminating the possibility of Cadant common stockholders receiving fair market value financing or a fair market value sales price in the case of a sale of Cadant.

327. Disinterested Cadant directors requested C. Walker to discuss financing alternatives with GunnAllen, as well as other independent third-parties that could offer a financing alternative that would be fair to Cadant common stockholders.

328. C. Walker refused to contact GunnAllen and rather pursued solely common stockholder cramdown type financing.

329. Disinterested Cadant directors requested C. Walker to discuss financing alternatives with Asia-Wired Group, who had performed preliminary due diligence on Cadant and indicated that they had discussed a $15 million - $20 million equity financing with an Asia based manufacturing concern.

330. C. Walker refused to enter into good-faith discussions with Asia-Wired Group.

331. Disinterested Cadant directors requested that C. Walker initiate discussions with independent third-party capital sources for equity financing fair to Cadant common stockholders.

332. C. Walker refused and failed to undertake any good faith discussions with independent third-party capital sources for equity financing fair to Cadant common stockholders, but rather only pursued common stockholder cramdown type financing.

333. On July 30, 2001 Motorola, Inc. announced its intention to acquire River Delta Networks, one of Cadant's competitors, in a transaction valued at $300 million.

334.    As a result of Venrock Affiliates self-dealing in causing Cadant to enter into the First Venrock Bridge and Second Venrock Bridge, as well as C. Walker's refusal and failure to act in good faith and in the best interest of Cadant common stockholders, Cadant was presented with a term sheet for financing from the venture capitalist Comcast Interactive Capital, L.P., arranged by C. Walker and such term sheet is attached as Exhibit U (the "Comcast Financing").

335.    The Comcast Financing was yet another common stockholder cramdown financing that protected the Venrock Affiliates investments at the expense of Cadant common stockholders.

336.    The Comcast Financing provided for, inter alia,

> (i)     $40-45 million of financing;
>
> (ii)    a $20 million valuation of Cadant;
>
> (iii)   issuance of a Series B Preferred Stock with a 300% liquidation preference before any payment to Cadant common stockholders;
>
> (iv)    conversion of the Series B Preferred Stock on terms that effectively washed-out the Cadant common stockholders; and
>
> (v)     protection to the Venrock Affiliates through their planned participation in and conversion of their prior investments into Series B Preferred Stock.

337.    The Comcast Financing arranged by C. Walker was principally aimed toward substantially eliminating Cadant common stockholder value but protecting Venrock Affiliates and the employees.

338. The Comcast Financing arranged by C. Walker prohibited Cadant from negotiating or entering into a financing which would be fair to Cadant common stockholders, and required Cadant to deal exclusively with Comcast.

339. The Comcast Financing also provided for a substantial break-up fee to Comcast in the event of a sale of Cadant.

340. Cadant's capitalization following the C. Walker Comcast Financing would have increased the total common stock outstanding after conversion of all financings from 56,893,711 to 362,509,199 and would have required an approximate $150 million preference payment to Venrock Affiliates and Comcast before any payment to Cadant common stockholders.

341. At a meeting of the Cadant Board of Directors on September 21, 2001, the Comcast Financing was presented for discussion and approval or disapproval by the Board of Directors.

342. At the September 21, 2001 Board of Directors meeting C. Walker advised the members that it was the duty of the Board of Directors to act not in the best interest of Cadant common stockholders, but rather in the best interest of the Venrock Affiliates and Bridge Lenders.

343. At the September 21, 2001 Board of Directors meeting, the Board of Directors refused to undertake an analysis of alternatives that would be fair to Cadant common stockholders.

344. At the September 21, 2001 Board of Directors meeting the Venrock Affiliate Board of Director members authorized C. Walker to execute and deliver the Comcast Term Sheet, which specifically prohibited Cadant from procuring any alternative financing which would be fair to Cadant common stockholders.

345. On September 27, 2001, Cable Television Laboratories, Inc., a research and development consortium of cable television system operators representing North and South America, certified and qualified the Cadant C4 as the first high-density, carrier-class, chassis-based CMTS product for DOCSIS 1.1 compliance.

346. With the DOCSIS 1.1 certification Cadant had a significant competitive advantage over its other start-up competitors, including BAS, River Delta and Pacific Broadband.

347. With the DOCSIS 1.1 certification Cadant had established technical superiority over its competitors, including BAS, River Delta and Pacific Broadband.

348. Despite receipt of DOCSIS 1.1 certification, C. Walker continued in his effort to close the Comcast cram down financing for the benefit of only the Venrock Affiliates and in order to receive a personal fee as a result of such financing.

349. Comcast, in order to proceed with a financing, required Cadant common stockholder approval.

350. C. Walker threatened certain individual common stockholders that Cadant would be put into bankruptcy if the Comcast financing was not approved.

351. C. Walker did not provide any financial information or any other information to GunnAllen so that it could arrange alternative financing fair to Cadant common stockholders.

352. On or about November 5, 2001, C. Walker and V. Majeti sent a letter to the Cadant common stockholders offering such stockholders the right to participate in the Comcast Financing (the "Rights Offering"). A copy of the Rights Offering is attached as Exhibit V.

353.    The Rights Offering was fraudulent and materially misleading in that it failed to provide, inter alia, financial statements, terms and conditions of the offering, capitalization information and information regarding consequent dilution to existing stockholders or payments to be received by C. Walker in the event the Comcast Financing was consummated.

354.    The Rights Offering was designed by C. Walker and Venrock Affiliates to mislead Cadant common stockholders by falsely stating that "[i]f the Company does not receive [the common stockholder] questionnaire and confirmation interest form by November 5, 2001, [the common stockholder] will be deemed to have waived [their] ability to participate in the financing".

355.    Most Cadant common stockholders received the Rights Offering only one or two days before the purported waiver deadline date, and in some instances common stockholders received the Rights Offering after the purported waiver deadline date.

356.    C. Walker mailed a Notice of General Information Meeting for Stockholders and Employees to be held on November 30, 2001 at 3003 Corporate West Drive in Lisle, Illinois. The notice provided that only shareholders of record and employees of Cadant at the close of business on October 23, 2001 were invited to the meeting.

357.    C. Walker did not discuss with all members of the Cadant Board of Directors what information he intended to present or what was his true intention was in convening the Informational Meeting.

358.    At the Informational Meeting C. Walker provided selected information about the affairs of Cadant to convince the Cadant common stockholders to vote in favor of the Comcast Financing.

359. C. Walker refused to disclose to Cadant common stockholders the compensation he would receive if common stockholders voted to approve the Comcast Financing.

360. C. Walker failed to provide Cadant common stockholders full and complete financing statements at the Informational Meeting.

361. C. Walker attempted to intimidate Cadant common stockholders at the Informational Meeting by indicating that if they did not agree to the Comcast Financing he had arranged they would lose their entire investment.

362. On November 8, 2001, the Venture Group Lawyers, on behalf of the Venrock Affiliates, forwarded to certain Cadant common stockholders to sign a full and complete release which would forever release all liability from Venrock Affiliates and all directors including but not limited to liability arising from the self-dealing financings of the past and the various breaches of fiduciary duty by the directors. A copy of the release is attached as Exhibit W.

363. Despite C. Walker's intimidation tactics the Cadant common stockholders refused to sign such release.

364. On November 13, 2001, C. Walker distributed a term sheet from Arris to purchase Cadant for four million shares of Arris common stock (approximately $30 million) plus an amount of one million additional shares of Arris Stock if 2002 sales of Cadant and Arris CMTS product sales equal or exceeds $73 million (the "Initial Arris Term Sheet").

365. On November 13, 2001, V. Majeti received a telephone call from Shlomo Rakib, the Chairman of the Board of Directors, President and Chief Technical Officer of Terayon Communication Systems, Inc. ("Terayon") to discuss the terms of a proposal that

Terayon was interested in submitting. S. Rakib indicated that the intent of the proposal would be to include a substantial payment to common stockholders of Cadant.

366.   On or about November 13, 2001 certain personnel from Cisco Systems, Inc. indicated an interest in bidding on Cadant.

367.   Arris had informed the Cadant Board of Directors in the summer of 2000 that they could not purchase Cadant due to organizational constraints.

368.   The Initial Arris Term Sheet included the assumption of certain other liabilities by Arris so that substantially all of the 4 million Arris shares plus any earnout shares would be available for distribution to pay the First Venrock Bridge and the Second Venrock Bridge and fees to C. Walker and certain others.

369.   The Initial Arris Term Sheet also provided for consideration to be paid to Cadant employees. In that regard Arris provided for a grant of up to an aggregate of 2 million shares of Arris stock to vest equally over four years.

370.   In effect, Arris had devised an offer that paid off the Venrock Affiliates, C. Walker, the employees and the other creditors of Cadant, but left nothing for the Cadant common stockholders.

371.   On information and belief, K. Bank provided information about the financial affairs of Cadant, including the fact that the Venrock Affiliates did not intend to provide any further financial support to Cadant and that Cadant could be purchased for a price much less than Motorola paid for River Delta or Juniper Networks, Inc. paid for Pacific Broadband, despite the technical superiority of Cadant's product.

372.   On information and belief, Arris knew that as a result of Venrock's actions of putting in place the First Venrock Bridge and the Second Venrock Bridge, Cadant was placed in a

forced liquidation/firesale posture and, therefore knew they could offer substantially less than they were willing to pay.

373.    The price Arris was willing to pay for Cadant in November of 2001, as a result of Cadant being placed in a forced liquidation/firesale posture, was a fraction of what they indicated was a fair value for Cadant in the summer of 2000.

374.    On November 14, 2001, Cadant held a meeting of the Board of Directors in Lisle, Illinois.

375.    On November 14, 2001, Arris common stock was trading at approximately $7.25 per share.

376.    At the November 14, 2001 meeting of the Board of Directors the Initial Arris Term Sheet was discussed and a resolution was approved for the creation of a finance and merger/acquisition committee consisting of K. Bank as Chairman with E. Copeland and F. Kopko as members (the "Transaction Committee").

377.    The Transaction Committee was to be fully apprised of all matters involving a potential transaction by Cadant.

378.    K. Bank undertook negotiations with Arris but did not keep the Transaction Committee informed. K. Bank never apprised all members of negotiations nor solicited any input with regard to such negotiations.

379.    On November 16, 2001, GunnAllen and Butler offered to finance Cadant working capital needs with both a short term payroll facility and additional more permanent financing that would be fair to common stockholders and also avert the need to sell Cadant in a forced fire sale to Arris. The intent of both GunnAllen and Butler was to provide funding

so that an auction process for the sale of Cadant could develop, enabling Terayon and Cisco the necessary time to submit proposals.

380.   C. Walker refused and failed to undertake any good faith discussions with GunnAllen and Butler to provide a financing for Cadant which could avert a forced fire sale to Arris.

381.   On November 16, 2001 K. Bank distributed to the Board of Directors of Cadant a revised Arris Term Sheet (the "Revised Arris Term Sheet"). The Revised Arris Term Sheet now included a side letter thereby preventing an auction process in the sale of Cadant (the "No-Shop Letter"). The No-Shop Letter is attached as Exhibit X.

382.   The No-Shop Letter foreclosed any bidding from Terayon or any other independent third party.

383.   The No-Shop Letter required that Cadant only deal with Arris in connection with a proposed sale despite apparent conflicts of interest between Cadant Board of Director members and an Arris Board of Director member.

384.   On November 17, 2001, at a telephonic meeting of the Cadant Board of Directors, K. Bank was asked to fully disclose whether or not he had any conflict of interest with respect to his role as Chairman of the Transaction Committee and his negotiation with Arris.

385.   K. Bank disclosed that, in fact, the Chairman of the Board of Directors of Arris, John M. Egan, was an investor in KB Partners, an affiliate of a lender in the First Venrock Bridge and the Second Venrock Bridge. K. Bank also disclosed that, in fact, John M. Egan was also a member of the advisory board to KB Partners but did not disclose what role J. Egan filled in such capacity nor what information was accessible to him.

386. At the November 17, 2001 Cadant Board of Directors meeting, K. Bank refused to disclose the extent of J. Egan's participation in KB Partners maintaining that such information was private and confidential.

387. On information and belief, J. Egan, through his participation on the advisory board to KB Partners, assisted in identifying and evaluating investment opportunities such as Cadant.

388. On information and belief, J. Egan was on the advisory board of KB Partners Venture Fund II, L.P. ("KB Venture II"), the actual fund that participated in the First Venrock Bridge, which bridge had severe negative consequences on the value of Cadant.

389. On information and belief, J. Egan was on the advisory board of KB Venture II when KB Venture II invested in the Second Venrock Bridge on the unfair terms and conditions dictated by the Venrock Affiliates which Second Venrock Bridge had further negative consequences on the value of Cadant.

390. J. Egan served as Chairman of the Board of Directors of Antec in the summer of 2000 when TWP contacted the Arris/Antec/Nortel Family.

391. At the November 17, 2001 Cadant Board of Directors meeting, the revised Arris term sheet was discussed among the Board of Directors.

392. The Revised Arris Term Sheet provided for Cadant to receive 5.25 million shares of Arris common stock plus an earnout of two million additional shares of Arris common stock if Cadant and Arris CMTS product 2002 sales equalled $100 million.

393. The Cadant Board of Directors expected only 1 million shares to be received under the earnout based upon expected 2002 sales.

394. The Revised Arris Term Sheet negotiated by K. Bank included the assumption of certain other liabilities by Arris so that substantially all of the 5.25 million Arris shares plus any

earnout shares would be available for distribution to pay the First Venrock Bridge, the Second Venrock Bridge and the Initial Venrock Investment plus a substantial profit to certain Venrock Affiliates.

395. The Revised Arris Term Sheet negotiated by K. Bank included more favorable terms with respect to the 2 million shares of Arris stock to be granted to Cadant employees, as well as an outright grant of an additional 250,000 shares of Arris common stock to certain Cadant employees.

396. The Revised Arris Term Sheet negotiated by K. Bank provided for no consideration to be paid to the Cadant common stockholders.

397. Despite the GunnAllen and Butler offer and the indication of interest from an independent third party to negotiate a transaction for the purchase of Cadant, the Venrock Affiliate Board of Directors voted in favor of the Arris transaction, voted to end any possibility to create an auction process (through the execution of the No-Shop Letter), and voted to approve a bridge loan from Arris to fund operations until a definite agreement was reached.

398. Arris began funding Cadant working capital needs on November 19, 2001 pursuant to a bridge financing.

399. GunnAllen and Butler offered such financing to C. Walker, but C. Walker refused to negotiate such financing arrangements in good faith.

400. Butler made repeated attempts to discuss financing with S. Oppenheimer.

401. C. Walker and S. Oppenheimer acted in a manner only to immediately benefit Venrock Affiliates at the expense of the Cadant common stockholders and were unwilling to discuss a financing from GunnAllen and Butler that would avoid a fire sale to Arris.

402. On November 26, 2001, Comcast Interactive Capital notified C. Walker and V. Majeti and the Board of Directors of Cadant that as a result of the anticipated Arris transaction, pursuant to the Comcast Term Sheet approved by the Venrock Affiliate Board of Directors of Cadant, Cadant would owe Comcast $2,055,000 in cash upon the consummation of the Arris transaction.

403. On November 28, 2001, the proposed acquisition of Cadant by Arris was announced in a joint press release by Cadant and Arris.

404. As a result of the Venrock Affiliate Board of Directors of Cadant approval of the Comcast Term Sheet, the likelihood of the common stockholders of Cadant receiving any consideration in the Arris transaction was substantially diminished or eliminated.

405. Since the submission of the Initial Arris Term Sheet and the announcement of the acquisition of Cadant, the Arris common stock has steadily increased to over $10.00.

406. On December 2, 2001 a telephonic meeting of the Board of Directors of Cadant was held for the purpose of discussing the terms and fairness of the Arris transaction.

407. Thomas Weisel Partners prepared a written presentation for the Cadant Board which included a situation overview, sales overview, valuation analysis and pro forma merger analysis (the "Weisel Presentation").

408. The Weisel Presentation demonstrated that the self-dealing financing of the Venrock Affiliates which caused going-concern issues for Cadant in its sales process was a significant reason for the relatively low sales price from Arris.

409. The Cadant Board also received a copy of the draft of the Asst Purchase Agreement by and between Arris Group, Inc. dated November 29, 2001 (the "Arris Purchase Agreement").

410. This Asset Purchase Agreement required Cadant to represent and warrant, inter alia, that:

   (i)  the corporation is duly organized, validly existing and in good standing under the laws of the state of Delaware;

   (ii)  the corporation had the requisite corporate power and authority to execute and deliver the agreement;

   (iii)  that the sale has been duly authorized by stockholder action;

   (iv)  that the consummation of the transaction did not constitute a violation of Cadant's charter documents; and

   (v)  that Cadant is in compliance with all applicable laws.

411. Counsel for Cadant advised the Board of Directors that the Asset Purchase Agreement would provide Arris with the right to monetary damages from Cadant if the transaction was not properly approved by Cadant common stockholders.

412. The Board of Directors of Cadant were on notice at the December 2, 2001 meeting that the proxies obtained in connection with Cadant's reincorporation in Delaware were illegally obtained from Cadant common stockholders and, therefore, rendered the reincorporation null and void.

413. The Board of Directors approved the Asset Purchase Agreement in bad faith with full knowledge that they could not make the representations and warranties contained therein.

414. The Venrock Affiliates on the Cadant Board of Directors also approved an immediate dissolution of Cadant following the consummation of the Arris transaction and a distribution to Venrock Affiliates and certain employees.

415. With the Arris share price at approximately $11.00, Cadant common stockholders called C. Walker to learn what they could expect in a distribution as a result of the sale to Arris.

C. Walker informed such common stockholders that they would receive nothing and that they would lose their entire investment.

416. By December 1, 2001 and as a result of the announcement of Cadant by Arris, the price per share of Arris common stock had risen to approximately $11.50 per share.

417. The Venrock Affiliate Board of Directors had, however, authorized 275,000 shares of Arris common stock to be received by Cadant in the Arris transaction to be paid to three employees of Cadant, which eliminated what little return the Cadant common stockholders might receive as a result of the Arris share price increase.

418. The Venrock Affiliate Board of Directors awarded a pay-off of 100,000 shares of Arris common stock each to Thomas Cloonan ("Cloonan") and Daniel Hickey ("Hickey") because the common stock they each owned in Cadant would have little value as a result of the Arris Transaction.

419. The pay-off to Cloonan and Hickey was authorized by the Venrock Affiliate Board of Directors despite their knowledge that such pay-off expense would be entirely borne by the common stockholders of Cadant.

420. The Venrock Affiliate Board of Directors of Cadant awarded a pay-off of 75,000 shares of Arris common stock to V. Majeti because the common stock he owned in Cadant would have little value as a result of the Arris Transaction.

421. The pay-off to V. Majeti was given to him by the Venrock Affiliate Board of Directors of Cadant so that V. Majeti would vote his shares of Cadant in favor of the Arris Transaction.

422. The pay-off to V. Majeti was authorized by the Venrock Affiliate Board of Directors despite their knowledge that such pay-off expense would be entirely borne by the common stockholders of Cadant.

423. C. Walker and other Venrock Affiliates threatened V. Majeti with a lawsuit against him personally if he did not vote his shares in favor of the Arris transaction.

424. Venrock Affiliates completed their scheme to defraud Cadant common stockholders in agreeing to transfer all of Cadant's assets to Arris without the constructive or actual knowledge of Cadant common stockholders.

425. In December 2001, the law firm of Williams, Schifino, Mangione & Steady, on behalf of certain common stockholders, put Cadant on notice of the misleading Proxy Statement pursuant to which illegal proxies were obtained to reincorporate Cadant in Delaware and transfer all the assets of Cadant's business without notification, the consent of or in many instances the knowledge of Cadant common stockholders (the "Illegal Reincorporation Proxy Notice").

426. On information and belief in December, 2001, Arris was also put on notice of the Illegal Reincorporation Proxy Notice.

427. Arris knew the transfer of all of the assets of Cadant by Venrock Affiliates was illegal.

428. Venrock Affiliate Board of Directors of Cadant caused Cadant to fully indemnify Arris against loss for any damages Arris may incur as a result of the illegal transfer of all of Cadant's assets to Arris.

429. Cadant's agreement to indemnify Arris for damages in connection with the illegal transfer of assets is null and void and against public policy.

430.    On January 8, 2001 all of the assets of Cadant were transferred to Arris without a proper vote of the Cadant common stockholders pursuant to applicable state law.

431.    No disclosure of any kind was mailed to all Cadant common stockholders to obtain the approval of the Cadant common stockholders for the Arris Transaction until after the date of the actual closing and transfer of all of the Cadant assets.

432.    Venrock Affiliate Board of Directors of Cadant knowingly caused the illegal transfer of all of Cadant's assets to Arris.

433.    As a direct result of the actions of Venrock Affiliate Board of Directors of Cadant, the common stock in Cadant has no value and the Cadant common stockholders have lost their entire investment.

## FIRST CLAIM – BREACH OF FIDUCIARY DUTY
### (Against Defendant Eric Copeland)

434.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 433.

435.    Under Maryland law, defendant Eric Copeland owed fiduciary and related duties to Cadant and the common stockholders.[4] Maryland General Corporation Law, Section 2-405.1 (a) provides:

    (a)     A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

    (1)     In good faith;

    (2)     In a manner he reasonably believes to be in the best interests of the corporation; and

---

[4] Similar fiduciary duties are owed by directors under Delaware and Illinois law. See Del. General Corporation Law, §141 and cases thereunder, such as Smith v. Van Gorkom, 488 A 2.d 858 (1985) (Delaware), and 805 ILCS 5/8.05 and cases thereunder, such as Bingham v. Ditzler, 309 Ill App.581 (1941) (Illinois).

(3)     With the care that an ordinarily prudent person in a like position would use under similar circumstances.

436.   Defendant Copeland's fiduciary duties included but were not limited to, duties of inquiry, due care, loyalty, disclosure and fidelity.  Such duties required the defendant to ensure that due care and diligence were exercised in the management of Cadant; and that procedures were established to ensure the sound management and eventual profitability of Cadant.

437.   Defendant Copeland knew or should have known of his duties and responsibilities under the law.

438.   Defendant Copeland breached his fiduciary duties to Cadant and the common stockholders by:  (1) failing to keep the Cadant common stockholders apprised of the financial condition of Cadant; (2) failing to exercise reasonable care with respect to the financial affairs of Cadant; (3) rejecting highly profitable acquisition and financing proposals outright, without proper investigation, and without undertaking any viable alternative courses of action for Cadant; (4) arranging for damaging, self-dealing bridge loans to be placed on Cadant on terms much less favorable than those that would have been provided by disinterested parties; (5) arranging for directors to be appointed to the Board of Cadant without proper disclosures as to conflicts of interest; (6) submitting a proxy statement to the common stockholders of Cadant containing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholders; (7) managing the financial affairs of Cadant in a manner such that Cadant would have no alternative but to accept self-dealing bridge loans, containing unfavorable terms and conditions; (8) failing to provide full information to Cadant common

stockholders of such bridge loan documentation; (9) failing to consider sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (10) taking actions for the purpose of "squashing" the Cadant common stockholders; (11) deliberately sabotaging efforts to obtain alternative financing on terms and conditions more favourable to Cadant and its common stockholders; (12) deliberately placing Cadant in a default position with respect to the self-dealing bridge financings; (13) providing fraudulent and materially misleading disclosures, and failing to disclose material information to Cadant common stockholders with respect to a proposed financing from Comcast; (14) agreeing to negotiate exclusively with Comcast a financing which was unfair to common stockholders; (15) failing to conduct a fair auction process in the sale of Cadant to maximize common stockholder value and find the best deal possible for common stockholders; (16) agreeing to an unfair, fire-sale purchase agreement with Arris Group, Inc.; (17) improperly and without proper corporate purpose authorizing the paying-off of three Cadant employees with Arris stock which would have accrued primarily to the Cadant common stockholders; (18) agreeing to sell the assets of Cadant to Arris Group, Inc. without the knowledge or approval of the Cadant common stockholders; and (19) in general, placing his and his affiliates own private interests above those of Cadant or its common stockholders.

439.    As a proximate result of defendant's breaches of fiduciary duties, plaintiffs have suffered damages in an amount to be proven at trial, but which amount is alleged to be in excess of $100,000,000.

## SECOND CLAIM – BREACH OF FIDUCIARY DUTY
### (Against Defendant Charles Walker)

440.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 439.

441.    Under Maryland law, defendant Charles Walker owed fiduciary and related duties to Cadant and the common stockholders.  Maryland General Corporation Law, Section 2-405.1 (a) provides:

    (a)    A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

        (1)    In good faith;

        (2)    In a manner he reasonably believes to be in the best interests of the corporation; and

        (3)    With the care that an ordinarily prudent person in a like position would use under similar circumstances.

442.    Defendant Walker's fiduciary duties included but were not limited to, duties of inquiry, due care, loyalty, disclosure and fidelity.  Such duties required the defendant to ensure that due care and diligence were exercised in the management of Cadant; and that procedures were established to ensure the sound management and eventual profitability of Cadant.

443.    Defendant Walker knew or should have known of his duties and responsibilities under the law.

444.    Defendant Walker breached his fiduciary duties to Cadant and the common stockholders by:  (1) failing to keep the Cadant common stockholders apprised of the financial condition of Cadant; (2) failing to exercise reasonable care with respect to the financial affairs of Cadant; (3) rejecting financing proposals outright, without proper investigation,

and without undertaking any viable alternative courses of action for Cadant; (4) arranging for damaging, self-dealing bridge loans to be placed on Cadant on terms much less favorable than those that would have been provided by disinterested parties; (5) managing the financial affairs of Cadant in a manner such that Cadant would have no alternative but to accept self-dealing bridge loans, containing unfavorable terms and conditions; (6) failing to provide full information to Cadant common stockholders of such bridge loan documentation; (7) failing to consider sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (8) taking actions for the purpose of "squashing" the Cadant common stockholders; (9) deliberately sabotaging efforts to obtain alternative financing on terms and conditions more favorable to Cadant and its common stockholders; (10) deliberately placing Cadant in a default position with respect to the self-dealing bridge financings; (11) providing fraudulent and materially misleading disclosures, and failing to disclose material information to Cadant common stockholders with respect to a proposed financing from Comcast; (12) agreeing to negotiate exclusively with Comcast a financing which was unfair to Cadant common stockholders; (13) agreeing to an unfair, fire-sale purchase agreement with Arris Group, Inc.; (14) failing to conduct a fair auction process in the sale of Cadant to maximize common stockholder value and find the best deal possible for common stockholders; (15) agreeing to negotiate exclusively with Comcast a financing which was unfair to Cadant common stockholders; (16) improperly and without proper corporate purpose authorizing the paying-off of three Cadant employees with Arris stock which would have accrued primarily to the Cadant common stockholders; (17) agreeing to sell the assets of Cadant to Arris Group, Inc. without the knowledge or approval of the Cadant common

stockholders; and (18) in general, placing his and his affiliates own private interests above those of Cadant or its common stockholders.

445.    As a proximate result of defendant's breaches of fiduciary duty, plaintiffs have suffered damages in an amount to be proven at trial but which amount is alleged to be in excess of $100,000,000.

### THIRD CLAIM – BREACH OF FIDUCIARY DUTY
### (Against Defendant Stephan Oppenheimer)

446.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 445.

447.    Under Maryland law, defendant Stephan Oppenheimer owed fiduciary and related duties to Cadant and the common stockholders. Maryland General Corporation Law, Section 2-405.1 (a) provides:

(a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1)    In good faith;

(2)    In a manner he reasonably believes to be in the best interests of the corporation; and

(3)    With the care that an ordinarily prudent person in a like position would use under similar circumstances.

448.    Defendant Oppenheimer's fiduciary duties included but were not limited to, duties of inquiry, due care, loyalty, disclosure and fidelity. Such duties required the defendant to ensure that due care and diligence were exercised in the management of Cadant; and that procedures were established to ensure the sound management and eventual profitability of Cadant.

449.    Defendant Oppenheimer knew or should have known of his duties and responsibilities under the law.

450.    Defendant Oppenheimer breached his fiduciary duties to Cadant and the common stockholders by: (1) failing to keep the Cadant common stockholders apprised of the financial condition of Cadant; (2) failing to exercise reasonable care with respect to the financial affairs of Cadant; (3) rejecting financing proposals outright, without proper investigation, and without undertaking any viable alternative courses of action for Cadant; (4) arranging for damaging, self-dealing bridge loans to be placed on Cadant on terms much less favourable than those that would have been provided by disinterested parties; (5) failing to consider sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (6) taking actions for the purpose of "squashing" the Cadant common stockholders; (7) deliberately sabotaging efforts to obtain alternative financing on terms and conditions more favorable to Cadant and its common stockholders; (8) deliberately placing Cadant in a default position with respect to the self-dealing bridge financings; (9) providing fraudulent and materially misleading disclosures, and failing to disclose material information to Cadant common stockholders with respect to a proposed financing from Comcast; (10) agreeing to negotiate exclusively with Comcast a financing which was unfair to Cadant common stockholders; (11) agreeing to an unfair, fire-sale purchase agreement with Arris Group, Inc.; (12) failing to conduct a fair auction process in the sale of Cadant to maximize common stockholder value and find the best deal possible for common stockholders; (13) improperly and without proper corporate purpose authorizing the paying-off of three Cadant employees with Arris stock which would have accrued primarily to the Cadant common stockholders; (14) agreeing

to sell the assets of Cadant to Arris Group, Inc. without the knowledge or approval of the Cadant common stockholders; and (15) in general, placing his and his affiliates own private interests above those of Cadant or its common stockholders.

451. As a proximate result of defendant's breaches of fiduciary duty, plaintiffs have suffered damages in an amount to be proven at trial, but which amount is alleged to be in excess of $100,000,000.

## FOURTH CLAIM – BREACH OF FIDUCIARY DUTY
### (Against Defendant C.H. Randolph Lyon)

452. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 451.

453. Under Maryland law, defendant C.H. Randolph Lyon owed fiduciary and related duties to Cadant and the common stockholders. Maryland General Corporation Law, Section 2-405.1 (a) provides:

(a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:

(1) In good faith;

(2) In a manner he reasonably believes to be in the best interests of the corporation; and

(3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

454. Defendant Lyon's fiduciary duties included but were not limited to, duties of inquiry, due care, loyalty, disclosure and fidelity. Such duties required the defendant to ensure that due care and diligence were exercised in the management of Cadant; and that procedures were established to ensure the sound management and eventual profitability of Cadant.

455. Defendant Lyon knew or should have known of his duties and responsibilities under the law.

456. Defendant Lyon breached his fiduciary duties to Cadant and the common stockholders by: (1) failing to keep the Cadant common stockholders apprised of the financial condition of Cadant; (2) failing to exercise reasonable care with respect to the financial affairs of Cadant; (3) rejecting financing proposals outright, without proper investigation, and without undertaking any viable alternative courses of action for Cadant; (4) arranging for damaging, self-dealing bridge loans to be placed on Cadant on terms much less favorable than those that would have been provided by disinterested parties; (5) managing the financial affairs of Cadant in a manner such that Cadant would have no alternative but to accept self-dealing bridge loans, containing unfavorable terms and conditions; (6) failing to provide full information to Cadant common stockholders of such bridge loan documentation; (7) failing to consider sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (8) deliberately placing Cadant in a default position with respect to the self-dealing bridge financings; and (9) failing to conduct a fair auction process in the sale of Cadant to maximize common stockholder value and find the best deal possible for common stockholders.

457. As a proximate result of defendant's breaches of fiduciary duty, plaintiffs have suffered damages in an amount to be proven at trial, but which amount is alleged to be in excess of $100,000,000.

## FIFTH CLAIM
### (Derivative Claim for Breach of Fiduciary Duties Against Defendants Cadant, Eric Copeland, Charles Walker, Stephan Oppenheimer, and C. Randolph Lyon)

458. Plaintiffs reallege and incorporate by references the allegations of paragraphs 1 through 457.

459. Plaintiffs brings this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

460. Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel in the field of federal litigation.

461. Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)    The Cadant Board of Directors participated in the wrongs complained of;

    (ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

    (iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)   Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)   The acts complained of herein are wrongful, and thus are acts incapable of ratification;

(vi)   The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the officers responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

462.   Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

463. Each of these defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company and to the shareholders.

464. Each of these defendants conspired to abuse, and did abuse, the control reposited in them by virtue of their high-level positions in the Company.

465. By reason of the foregoing, each of these defendants has caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

466. Cadant has been injured by reason of these defendants' intentional breach and/or reckless disregard of their fiduciary duties to Cadant. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for Cadant as hereinafter set forth.

**SIXTH CLAIM – VIOLATION OF SECTION 10(b) and RULE 10b-5 OF THE SECURITIES EXCHANGE ACT OF 1934**
**(Derivative Claim Against Cadant, Venrock Associates, Venrock Associates II L.P., Venrock Entrepreneurs Fund L.P. , Hambrecht & Quist California, H&Q Employee Ventures Fund 2000, L.P., Access Technology Partners II, L.P. Access Technology Partners Brokers Fund L.P., H&Q Cadant Investors L.P. and Chase Equity Associates, L.L.C.)**

467. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 466.

468. Pursuant to the purchase agreement attached hereto as Exhibit E, on or shortly after January 21, 2000 Venrock Associates, Venrock Associates II, L.P., Venrock Entrepreneurs Fund, L.P., Hambrecht & Quist California, H&Q Employee Venture Fund 2000, L.P., Access Technology Partners II, L.P., Access Technology Partners Brokers Fund, L.P., H&Q Cadant Investors, L.P. and Chase Equity Associates, L.L.C. ("Venrock

Affiliates") purchased approximately 7,500,000 shares of Series A Preferred Stock in Cadant.

469.    Rule 10b-5 of the Securities Exchange Act of 1934 provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

     (a)     to employ any device, scheme, or artifice to defraud,

     (b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

     (c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

470.    In connection with Cadant's sale of securities to the Venrock Affiliates such Venrock Affiliates deliberately failed to disclose to Cadant the following facts, among others: (1) that they planned for directors to be appointed to the Board of Cadant who would be under the control of the Venrock Affiliates; (2) that they were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3) that they planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that they planned to ignore any sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (5) that they planned to take actions for the purpose of "squashing" the

- 76 -

Cadant common stockholders; and (6) that they planned, in general, to place their own private interests above those of Cadant or its common stockholders.

471. Cadant relied on these misrepresentations of the Venrock Affiliates in agreeing to sell the Venrock Affiliates approximately 7,500,000 shares of Series A Preferred Stock of Cadant.

472. Due to the nature of the misrepresentations, Cadant was damaged substantially by issuing shares of Series A Preferred Stock that were detrimental to Cadant and its common stockholders.

473. Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

474. Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

475. Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)    The Cadant Board of Directors participated in the wrongs complained of;

    (ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

(iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or the other defendants named herein who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)    The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the other defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it

incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

476. Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

477. In addition to causing the Company to violate laws of the United States as hereinabove alleged, each of these defendants, singly and in concert, engaged in conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company and to the shareholders.

478. By reason of the foregoing, each of these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

479. Cadant has been injured by reason of these defendants' violation of laws of the United States. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

**SEVENTH CLAIM – VIOLATION OF SECTION 10(B) AND RULE
10b-5 OF THE SECURITIES EXCHANGE ACT OF 1934
(Derivative Claim Against Cadant, Venrock Associates, Venrock Associates II, L.P.,
Venrock Entrepreneurs Fund, L.P., KB Partners Venture Fund II, L.P.,
KB Partners Affiliates Fund II, L.P., and J.P. Morgan Partners, LLC)**

480. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 479.

481. Pursuant to the Convertible Secured Bridge Loan Agreement, attached as Exhibit M, on or shortly after February 1, 2001, J.P. Morgan Partners LLC, Venrock Associates, Venrock Associates II, L.P., Venrock Entrepreneurs Fund, L.P., KB Partners Ventures Fund II, L.P., KB Partners Affiliates Fund II, L.P. and Westmoreland Capital Associates

I, LLC (together with the Venrock Affiliates and KB Partners Venture Fund II, L.P. and KB Partners Affiliates Fund II, L.P., the "First Venrock Bridge Affiliates"), purchased approximately $11,000,000 of Convertible Secured Bridge Notes from Cadant.

482.    Rule 10b-5 of the Securities Exchange Act of 1934 provides as follows:

It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a)    to employ any device, scheme, or artifice to defraud,

(b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

483.    In connection with Cadant's sale of securities to the First Venrock Bridge Affiliates, such First Venrock Bridge Affiliates deliberately failed to disclose to Cadant the following facts, among others: (1) that they planned for directors to be appointed to the Board of Cadant who would be under the control of the Venrock Affiliates and the First Venrock Bridge Affiliates; (2) that such directors were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3)  that they planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that such directors planned to ignore any sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (5) that they planned to take actions for the purpose of "squashing" the Cadant common stockholders; and (6) that they planned, in general, to place their own private interests above those of Cadant or its common stockholders.  In addition, the First Venrock Bridge Affiliates misrepresented the purpose of the financing.

484. Cadant relied on these misrepresentations of the First Venrock Bridge Affiliates in agreeing to issue to the First Venrock Bridge Affiliates approximately $11,000,000 of Convertible Secured Bridge Notes.

485. Due to the nature of the misrepresentations, Cadant was damaged substantially by issuing Convertible Secured Bridge Notes that were detrimental to Cadant and its common stockholders.

486. Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

487. Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

488. Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)    The Cadant Board of Directors participated in the wrongs complained of;

    (ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

    (iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the

Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or the other defendants named herein who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)    The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the other defendants named herein responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

489.    Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

490.    In addition to causing the Company to violate laws of the United States as hereinabove alleged, each of these defendants, singly and in concert, engaged in conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company and to the shareholders.

491.    By reason of the foregoing, each of these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

492.    Cadant has been injured by reason of the these defendants' violations of laws of the United States.  Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

### EIGHTH CLAIM - VIOLATION OF SECTION 10(B) AND RULE 10B-5 OF THE SECURITIES ACT OF 1934 (Derivative Claim Against Cadant and Eric Copeland)

493.    Plaintiffs reallege and incorporated by reference the allegations of paragraphs 1 through 492.

494.    At all times relevant hereto, Copeland was a director of Cadant, and was affiliated with certain Venrock Affiliates and certain First Venrock Bridge Affiliates.

495.    Rule 10b-5 of the Securities Exchange Act of 1934 provides as follows:

It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a)    to employ any device, scheme, or artifice to defraud,

(b)   to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)   to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

496.   In connection with Cadant's issuance of approximately 7,500,000 shares of Series A Preferred Stock to the Venrock Affiliates, and in connection with Cadant's sale of $11,000,000 of Convertible Secured Bridge Notes to the First Venrock Bridge Affiliates, Copeland failed to disclose to Cadant the following facts among others: (1) that the Venrock Affiliates and the First Venrock Bridge Affiliates planned for directors to be appointed to the Board of Cadant who would be under the control of such Venrock Affiliates and First Venrock Bridge Affiliates; (2) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and First Venrock Bridge Affiliates, were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned to ignore any sources of financing other than venture capital style financing; (5) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned to take actions for the purpose of "squashing" the common stockholders; and (6) that the Venrock Affiliates, the

First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned, in general, to place their own private interests above those of Cadant or its common stockholders.

497. Cadant relied on these misrepresentations of Copeland in agreeing to issue the Venrock Affiliates approximately 7,500,000 shares of Series A Preferred Stock of Cadant and to issue to the First Venrock Bridge Affiliates approximately $11,000,000 in Convertible Secured Bridge Notes.

498. Due to the nature of the misrepresentations, Cadant was damaged substantially by issuing shares of Series A Preferred Stock and by issuing Convertible Secured Bridge Notes that were detrimental to Cadant and its common stockholders.

499. Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

500. Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

501. Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

     (i)     The Cadant Board of Directors participated in the wrongs complained of;

(ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

(iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or the other defendants named herein who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)    The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has

impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

502.   The defendants named herein are responsible for the losses and damages suffered by Cadant.

503.   In addition to causing the Company to violate laws of the United States as hereinabove alleged, these defendants engaged in conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company and to the shareholders.

504.   By reason of the foregoing, these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

505.   Cadant has been injured by reason of these defendants' intentional violations of the laws of the United States. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

### NINTH CLAIM - VIOLATION OF SECTION 10(B) AND RULE 10B-5 OF THE SECURITIES EXCHANGE ACT OF 1934 (Derivative Claim Against Cadant and Charles Walker)

506.   Plaintiffs reallege and incorporated by reference the allegations of paragraphs 1 through 505.

507.   Since January 10, 2001, Walker was a director and, since May 31, 2001, interim Chief Executive Officer of Cadant.   In addition, on information and belief, Walker was affiliated with certain of the First Venrock Bridge Affiliates, including KB Partners Venture Fund II, L.P. and KB Partners Affiliates Fund II, L.P.

508.   Rule 10b-5 of the Securities Exchange Act of 1934 provides as follows:

It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a)     to employ any device, scheme, or artifice to defraud,

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

509.     In connection with Cadant's sale of $11,000,000 of Convertible Secured Bridge Notes to the First Venrock Bridge Affiliates, Walker failed to disclose to Cadant the following facts: (1) that the First Venrock Bridge Affiliates planned for directors to be appointed to the Board of Cadant who would be under the control of the Venrock Affiliates and the First Venrock Bridge Affiliates; (2) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates, were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned to ignore any sources of financing other than venture capital style financing; (5) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned to take actions for the purpose of

"squashing" the common stockholders; and (6) that the Venrock Affiliates, the First Venrock Bridge Affiliates, and the directors appointed by or affiliated with the Venrock Affiliates and the First Venrock Bridge Affiliates planned, in general, to place their own private interests above those of Cadant or its common stockholders.

510.    Cadant relied on these misrepresentations of Walker in agreeing to issue to the First Venrock Bridge Affiliates approximately $11,000,000 in Convertible Secured Bridge Notes.

511.    Due to the nature of these misrepresentations, Cadant was damaged substantially by issuing Convertible Secured Bridge Notes that were detrimental to Cadant and its common stockholders.

512.    Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

513.    Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

514.    Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)    The Cadant Board of Directors participated in the wrongs complained of;

(ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

(iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or the other defendants named herein who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)    The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has

impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

515.    The defendant named herein is responsible for the losses and damages suffered by Cadant.

516.    In addition to causing the Company to violate laws of the United States as hereinabove alleged, this defendant engaged in conduct in intentional breach and/or reckless disregard of his fiduciary duties to the Company and to the shareholders.

517.    By reason of the foregoing, this defendant has caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

518.    Cadant has been injured by reason of this defendant's intentional violations of the laws of the United States. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

**TENTH CLAIM-BREACH OF FIDUCIARY DUTY**
**(Against Venrock Associates, Venrock Associates II, L.P.,**
**Venrock Entrepreneurs Fund, L.P., Hambrecht & Quist California,**
**H&Q Employee Ventures Fund 2000, L.P., Access Technology Partners**
**Brokers Fund, L.P., H&Q Cadant Investors, L.P. and**
**Chase Equity Associates L.L.C.)**

519.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 518.

520.    Following the closing of the Initial Venrock investment, the Venrock Affiliates effectively controlled the business affairs at Cadant.

521.    As control persons, the Venrock Affiliates and the First Venrock Bridge Affiliates owed fiduciary and related duties to the Cadant and the common stockholders. The Venrock

Affiliates and the First Venrock Bridge Affiliates duties included but were not limited to, duties of inquiry, due care, loyalty, disclosure and fidelity. Such duties required the defendants to ensure that due care and diligence were exercised in the management of Cadant; and that procedures were established to ensure the sound management and eventual profitability of Cadant.

522.    Venrock Affiliates and the First Venrock Bridge Affiliates knew or should have known of their duties and responsibilities under the law.

523.    The First Venrock Bridge Affiliates unilaterally determined the terms of the First Venrock Bridge.

524.    Defendant Venrock Affiliates and the First Venrock Bridge Affiliates breached their fiduciary duties to Cadant by : 1) failing to keep the common stockholders apprised of the financial condition of Cadant; 2) failing to exercise reasonable care with respect to the financial affairs of Cadant; 3) rejecting highly profitable acquisition and financing proposals outright, without proper investigation, and without undertaking any viable alternative courses of action for Cadant; 4) arranging for damaging, self-dealing bridge loans to be placed on Cadant on terms much less favorable than those that would have been provided by disinterested parties; 5) arranging for directors to be appointed to the Board of Cadant without proper disclosures as to conflicts of interest; 6) submitting a proxy statement to the common stockholders of Cadant containing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholders; 7) managing the financial affairs of Cadant in a manner such that Cadant would have no alternative but to accept self-dealing bridge loans, containing unfavorable terms and conditions; 8) failing to provide full information to Cadant common

stockholders of such bridge loan documentation; 9) failing to consider sources of financing other than unfair, unreasonably dilutive, self-dealing financing; 10) taking actions for the purpose of "squashing" the Cadant common stockholders; 11) deliberately sabotaging efforts to obtain alternative financing on terms and conditions more favorable to Cadant; 12) deliberately placing Cadant in a default position with respect to the self-dealing bridge financings; 13) providing fraudulent and materially misleading disclosures, and failing to disclose material information to Cadant common stockholders with respect to a proposed financing from Comcast; 14) agreeing to negotiate exclusively with Comcast a financing which was unfair to Cadant common stockholders; 15) failing to conduct a fair auction process in the sale of Cadant to maximize common stockholder value and find the best deal possible for common stockholders; 16) agreeing to an unfair, fire-sale purchase agreement with Arris Group, Inc.; 17) improperly and without proper corporate purpose authorizing the paying-off of three Cadant employees with Arris stock which without such pay-off would have accrued primarily to the Cadant common stockholders; 18) agreeing to sell the assets of Cadant to Arris Group, Inc. without the knowledge or approval of the Cadant common stockholders; and 19) in general, placing their own private interests above those of Cadant or its common stockholders.

525. As a proximate result of defendants' breaches of fiduciary duties, plaintiffs have suffered damages in an amount to be proven at trial, but which amount is alleged to be in excess of $100,000,000.

**ELEVENTH CLAIM**
**(Derivative Claim for Breach of Fiduciary Duties**
**Against Cadant, Venrock Associates, Venrock Associates II, L.P.,**
**Venrock Entrepreneurs Fund, L.P., Hambrecht & Quist California,**
**H&Q Employee Ventures Fund 2000, L.P., Access Technology Partners**
**Brokers Fund, L.P., H&Q Cadant Investors, L.P. and**

**Chase Equity Associates L.L.C.)**

526. Plaintiffs reallege and incorporate by references the allegations of paragraphs 1 through 525.

527. Following the closing of the Initial Venrock investment, the Venrock Affiliates effectively controlled the business affairs of Cadant.

528. As control persons, the Venrock Affiliates and the First Venrock Bridge Affiliates owed fiduciary and related duties to Cadant and the common stockholders. The Venrock Affiliates and the First Venrock Bridge Affiliates duties included but were not limited to, duties of inquiry, due care, loyalty, disclosure and fidelity. Such duties required the defendants to ensure that due care and diligence were exercised in the management of Cadant; and that procedures were established to ensure the sound management and eventual profitability of Cadant.

529. Venrock Affiliates and the First Venrock Bridge Affiliates knew or should have known of their duties and responsibilities under the law.

530. The First Venrock Bridge Affiliates unilaterally determined the terms of the First Venrock Bridge.

531. Defendant Venrock Affiliates and the First Venrock Bridge Affiliates breached their fiduciary duties to Cadant by : 1) failing to keep the common stockholders apprised of the financial condition of Cadant; 2) failing to exercise reasonable care with respect to the financial affairs of Cadant; 3) rejecting highly profitable acquisition and financing proposals outright, without proper investigation, and without undertaking any viable alternative courses of action for Cadant; 4) arranging for damaging, self-dealing bridge loans to be placed on Cadant on terms much less favorable than those that would have

been provided by disinterested parties; 5) arranging for directors to be appointed to the Board of Cadant without proper disclosures as to conflicts of interest; 6) submitting a proxy statement to the common stockholders of Cadant containing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholders; 7) managing the financial affairs of Cadant in a manner such that Cadant would have no alternative but to accept self-dealing bridge loans, containing unfavorable terms and conditions; 8) failing to provide full information to Cadant common stockholders of such bridge loan documentation; 9) failing to consider sources of financing other than unfair, unreasonably dilutive, self-dealing financing; 10) taking actions for the purpose of "squashing" the Cadant common stockholders; 11) deliberately sabotaging efforts to obtain alternative financing on terms and conditions more favorable to Cadant; 12) deliberately placing Cadant in a default position with respect to the self-dealing bridge financings; 13) providing fraudulent and materially misleading disclosures, and failing to disclose material information to Cadant common stockholders with respect to a proposed financing from Comcast; 14) agreeing to negotiate exclusively with Comcast a financing which was unfair to Cadant common stockholders; 15) failing to conduct a fair auction process in the sale of Cadant to maximize common stockholder value and find the best deal possible for common stockholders; 16) agreeing to an unfair, fire-sale purchase agreement with Arris Group, Inc.; 17) improperly and without proper corporate purpose authorizing the paying-off of three Cadant employees with Arris stock which without such pay-off would have accrued primarily to the Cadant common stockholders; 18) agreeing to sell the assets of Cadant to Arris Group, Inc. without the

knowledge or approval of the Cadant common stockholders; and 19) in general, placing their own private interests above those of Cadant or its common stockholders.

532.    Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

533.    Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

534.    Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

        (i)      The Cadant Board of Directors participated in the wrongs complained of;

        (ii)     The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

        (iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)     Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)      The acts complained of herein are wrongful, and thus are acts incapable of ratification;

(vi)     The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

535.     Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

536.  Each of these defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company and to the shareholders.

537.  Each of these defendants conspired to abuse, and did abuse, the control reposited in them by virtue of their high-level positions in the Company.

538.  By reason of the foregoing, each of these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

539.  Cadant has been injured by reason of these defendants' intentional breach and/or reckless disregard of their fiduciary duties to Cadant. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for Cadant as hereinafter set forth.

### TWELFTH CLAIM-BREACH OF FUCIARY DUTY
#### (Against Defendant Venture Law Group)

540.  Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 539.

541.  Following the closing of the Initial Venrock Investment, Venture Law Group was installed as the sole corporate counsel of Cadant.

542.  As corporate counsel, Venture Law Group owed fiduciary and related duties to Cadant and the common stockholders.

543.  Venture Law Group knew or should have known of their duties and responsibilities under the law.

544.  Defendant Venture Law Group breached their fiduciary duties to Cadant by 1) failing to advise the Cadant Board of Directors on the legal implications of the Venrock

Investments Financial Documents, including but not limited to the V. Majeti stock restriction agreement; 2) failing to disclose conflicts of interest to the Board of Directors of Cadant prior to the Initial Venrock Investment; 3) working with the Venrock Affiliates and the First Venrock Bridge Affiliates in connection with the Venrock Affiliates plan to control the financial and business affairs of Cadant for their own profit and acting in a manner to cause a loss for common stockholders; 4) preparing a proxy statement to the common stockholders of Cadant continuing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholder; 5) failing to advise the disinterested directors of Cadant that reincorporation in Delaware could be harmful to the interests of Cadant's common stockholders.

545.   As a proximate result of defendant's breaches of fiduciary duties, plaintiff have suffered damages in an amount to be proven at trial, but which amount is alleged to be in excess of $100,000, 000.

### THIRTEENTH CLAIM
#### (Derivative Claim for Breach of Fiduciary Duties Against Cadant and Venture Law Group)

546.   Plaintiff's reallege and incorporate by references the allegations of paragraphs 1 through 545.

547.   Following the closing of the Initial Venrock Investment, Venture Law Group was installed as the sole corporate counsel of Cadant.

548.   As corporate counsel, Venture Law Group owed fiduciary and related duties to Cadant and the common stockholders.

549.   Venture Law Group knew or should have known of their duties and responsibilities under the law.

550.    Defendant Venture Law Group breached their fiduciary duties to Cadant by 1) failing to advise the Cadant Board of Directors on the legal implications of the Venrock Investments Financial Documents, including but not limited to the V. Majeti stock restriction agreement; 2) failing to disclose conflicts of interest to the Board of Directors of Cadant prior to the Initial Venrock Investment; 3) working with the Venrock Affiliates and the First Venrock Bridge Affiliates in connection with the Venrock Affiliates plan to control the financial and business affairs of Cadant for their own profit and acting in a manner to cause a loss for common stockholders; 4) preparing a proxy statement to the common stockholders of Cadant continuing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholder; 5) failing to advise the disinterested directors of Cadant that reincorporation in Delaware could be harmful to the interests of Cadant's common stockholders.

551.    Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

552.    Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

553.    Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

(i)     The Cadant Board of Directors participated in the wrongs complained of;

(ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

(iii)   The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)     The acts complained of herein are wrongful, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the defendant named herein who is responsible for the

misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

554. The defendant named herein is responsible for the losses and damages suffered by Cadant.

555. The defendant named herein engaged in the aforesaid conduct in intentional breach and/or reckless disregard of its fiduciary duties to the Company and to the shareholders.

556. The defendant named herein conspired to abuse, and did abuse, the control reposited in them by virtue of its influence over the Company.

557. By reason of the foregoing, this defendant has caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

558. Cadant has been injured by reason of the this defendant's intentional breach and/or reckless disregard of its fiduciary duties to the Company. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

## FOURTEENTH CLAIM
### (Derivative Claim for Negligence Against Cadant and Venture Law Group)

559. Plaintiffs reallege and incorporate by references the allegations of paragraphs 1 through 558.

560. Following the closing of the Initial Venrock Investment, Venture Law Group was installed as the sole corporate counsel of Cadant.

561. As corporate counsel, Venture Law Group owed fiduciary and related duties to Cadant and the common stockholders.

562. Venture Law Group knew or should have known of their duties and responsibilities under the law.

563. Defendant Venture Law Group was negligent in performing its duties to Cadant by 1) failing to advise the Cadant Board of Directors on the legal implications of the Venrock Investments Financial Documents, including but not limited to the V. Majeti stock restriction agreement; 2) failing to disclose conflicts of interest to the Board of Directors of Cadant prior to the Initial Venrock Investment; 3) working with the Venrock Affiliates and the First Venrock Bridge Affiliates in connection with the Venrock Affiliates plan to control the financial and business affairs of Cadant for their own profit and acting in a manner to cause a loss for common stockholders; 4) preparing a proxy statement to the common stockholders of Cadant continuing material omissions and misstatements, for the purpose of removing control of Cadant from the common stockholder; 5) failing to advise the disinterested directors of Cadant that reincorporation in Delaware could be harmful to the interests of Cadant's common stockholders.

564. Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants.

Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

565. Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

566. Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)   The Cadant Board of Directors participated in the wrongs complained of;

    (ii)   The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

    (iii)   The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

    (iv)   Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)     The acts complained of herein are wrongful, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

567.   The defendant named herein is responsible for the losses and damages suffered by Cadant.

568.   By reason of the foregoing, this defendant has caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

569.   Cadant has been injured by reason of the this defendant's negligent fulfillment of its duties to the Company. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

**FIFTEENTH CLAIM**
**(Derivative Claim Against Cadant and Venture Law Group for**
**Aiding and Abetting the Venrock Affiliates to Commit Fraud)**

570. Plaintiffs reallege and incorporate by references the allegations of paragraphs 1 through 569.

571. Plaintiffs brings this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

572. Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

573. Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)    The Cadant Board of Directors participated in the wrongs complained of;

    (ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

    (iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)    The acts complained of herein are wrongful, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

574.    The defendant named herein is responsible for the losses and damages suffered by Cadant.

575. The defendant named herein aided and abetted the Venrock Affiliates to commit fraud in intentional breach and/or reckless disregard of its fiduciary duties to the Company and to the shareholders.

576. The defendant named herein conspired to abuse, and did abuse, the control reposited in them by virtue of their influence over the Company.

577. By reason of the foregoing, this defendant has caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

578. Cadant has been injured by reason of the this defendant's aiding and abetting of the fraud committed by the Venrock Affiliates. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

### SIXTEENTH CLAIM-FRAUD
**(Derivative Claim Against Cadant, Venrock Associates, Venrock Associates II L.P., Venrock Entrepreneurs Fund L.P. , Hambrecht & Quist California, H&Q Employee Ventures Fund 2000, L.P., Access Technology Partners II, L.P. Access Technology Partners Brokers Fund L.P. H&Q Cadant Investors L.P. and Chase Equity Associates, L.L.C.)**

579. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 578.

580. The Venrock Affiliates intentionally failed to make certain disclosures in order not to jeopardize the Venrock Initial Investment. Such Venrock Affiliates nondisclosures included the following: (1) that they planned for directors to be appointed to the Board of Cadant who would be under the control of the Venrock Affiliates; (2) that they were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3) that they planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that they planned to ignore any sources of financing other than venture capital

style financing; (5) that they planned to take actions for the purpose of "squashing" the Cadant common stockholders; and (6) that they planned, in general, to place their own private interests above those of Cadant or its common stockholders.

581.  Cadant relied on these misrepresentations of the Venrock Affiliates in agreeing to sell the Venrock Affiliates approximately 7,500,000 share of Series A Preferred Stock of Cadant.

582.  Due to the nature of the misrepresentations, Cadant was damaged substantially by issuing shares of Series A Preferred Stock that were detrimental to Cadant and its common stockholders.

583.  Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

584.  Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

585.  Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)    The Cadant Board of Directors participated in the wrongs complained of;

    (ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

(iii)   The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)     The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the other defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it

incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

586. Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

587. The Cadant defendants, singly and in concert, engaged in the aforesaid conduct in a fraudulent manner.

588. These Cadant defendants conspired to abuse, and did abuse, the control reposited in them by virtue of their high-level positions in the Company.

589. These defendants, singly and in concert, engaged in fraudulent conduct in reckless disregard of their fiduciary duties to the Company and to the shareholders.

590. By reason of the foregoing, these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

591. Cadant has been injured by reason of these defendants' fraudulent conduct and in reckless disregard of their fiduciary duties to the Company. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

**SEVENTEENTH CLAIM-FRAUD**
**(Derivative Claim Against Cadant, Venrock Associates, Venrock Associates II, L.P.,**
**Venrock Entrepreneurs Fund, L.P., KB Partners Venture Fund II, L.P.,**
**KB Partners Affiliates Fund II, L.P., and J.P. Morgan Partners, LLC)**

592. Plaintiffs reallege and incorporate by references the allegations of paragraphs 1 through 591.

593. The First Venrock Bridge Affiliates intentionally failed to make certain disclosures in order not to jeopardize the closing of the $11,000,000 of convertible secured notes in

January 2001. Such First Venrock Bridge Affiliates nondisclosures included the following: (1) that they planned for directors to be appointed to the Board of Cadant who would be under the control of the Venrock Affiliates and the First Venrock Bridge Affiliates; (2) that such directors were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3) that they planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that such directors planned to ignore any sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (5) that they planned to take actions for the purpose of "squashing" the Cadant common stockholders; and (6) that they planned, in general, to place their own private interests above those of Cadant or its common stockholders. In addition, the First Venrock Bridge Affiliates misrepresented the purpose of the financing.

594. Cadant relied on these misrepresentations of the First Venrock Bridge Affiliates in agreeing to issue to the First Venrock Bridge Affiliates approximately $11,000,000 of Convertible Secured Bridge Notes.

595. Due to the nature of the misrepresentations, Cadant was damaged substantially by issuing Convertible Secured Bridge Notes that were detrimental to Cadant and its common stockholders.

596. Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

597.    Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

598.    Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

(i)     The Cadant Board of Directors participated in the wrongs complained of;

(ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

(iii)   The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)     The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)     The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the other defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

599.     Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

600.     The Cadant defendants, singly and in concert, engaged in the aforesaid conduct in a fraudulent manner.

601.     These Cadant defendants conspired to abuse, and did abuse, the control reposited in them by virtue of their high-level positions in the Company.

602.     These defendants engaged in fraudulent conduct in reckless disregard of their fiduciary duties to the Company and to the shareholders.

603.     By reason of the foregoing, these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

604.   Cadant has been injured by reason of these defendants' fraudulent conduct in reckless disregard of their fiduciary duties to the Company. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

### EIGHTEENTH CLAIM-VIOLATION OF SECTION 10(B) AND RULE 10b-5 OF THE SECURITIES EXCHANGE ACT OF 1934
### (Derivative Claim Against Cadant, Venrock Associates, Venrock Associates II, L.P., Venrock Entrepreneurs Fund, L.P., KB Partners Venture Fund II, L.P., KB Partners Affiliates Fund II, L.P., and J.P. Morgan Partners, LLC)

605.   Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 604.

606.   Pursuant to the Second Venrock Bridge, attached as Exhibit S, on or shortly after May 29, 2001, J.P. Morgan Partners LLC, Venrock Associates, Venrock Associates II, L.P., Venrock Entrepreneurs Fund, L.P., KB Partners Ventures Fund II, L.P., and KB Partners Affiliates Fund II, L.P. (together with the Venrock Affiliates and KB Partners Venture Fund II, L.P. and KB Partners Affiliates Fund II, L.P., the "Second Venrock Bridge Affiliates"), purchased approximately $7,000,000 of Convertible Secured Bridge Notes from Cadant.

607.   Rule 10b-5 of the Securities Exchange Act of 1934 provides as follows:

It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

  (a)      to employ any device, scheme, or artifice to defraud,

  (b)      to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

608.    The Second Venrock Bridge Affiliates unilaterally determined the terms and conditions of the Second Venrock Bridge.

609.    In connection with Cadant's sale of securities to the Second Venrock Bridge Affiliates, such Second Venrock Bridge Affiliates deliberately failed to disclose to Cadant the following facts, among others: (1) that they planned for directors to be appointed to the Board of Cadant who would be under the control of the Venrock Affiliates and the First Venrock Bridge Affiliates; (2) that such directors were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3) that they planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that such directors planned to ignore any sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (5) that they planned to take actions for the purpose of "squashing" the Cadant common stockholders; and (6) that they planned, in general, to place their own private interests above those of Cadant or its common stockholders.  In addition, the Second Venrock Bridge Affiliates misrepresented the purpose of the financing.

610.    Cadant relied on these misrepresentations of the Second Venrock Bridge Affiliates in agreeing to issue to the Second Venrock Bridge Affiliates approximately $7,000,000 of Convertible Secured Bridge Notes.

611.    Due to the nature of the misrepresentations, Cadant was damaged substantially by issuing Convertible Secured Bridge Notes that were detrimental to Cadant and its common stockholders.

612. Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

613. Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

614. Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

    (i)    The Cadant Board of Directors participated in the wrongs complained of;

    (ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

    (iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

    (iv)    Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or these or other defendants named

herein who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)    The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)    The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the other defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

615.    Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

616.    In addition to causing the Company to violate laws of the United States as hereinabove alleged, each of these defendants, singly and in concert, engaged in fraudulent conduct in reckless disregard of their fiduciary duties to the Company and to the shareholders.

617.  By reason of the foregoing, each of these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

618.  Cadant has been injured by reason of these defendants' violation of laws of the United States. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

### NINETEENTH CLAIM-FRAUD
**(Derivative Claim Against Cadant, Venrock Associates, Venrock Associates II, L.P.,
Venrock Entrepreneurs Fund, L.P., KB Partners Venture Fund II, L.P.,
KB Partners Affiliates Fund II, L.P., and J.P. Morgan Partners, LLC)**

619.  Plaintiffs reallege and incorporate by references the allegations of paragraphs 1 through 618.

620.  The Second Venrock Bridge Affiliates intentionally failed to make certain disclosures in order not to jeopardize the closing of the $7,000,000 of convertible secured notes in May 2001. Such Second Venrock Bridge Affiliates nondisclosures included the following: (1) that they planned for directors to be appointed to the Board of Cadant who would be under the control of the Venrock Affiliates and the Second Venrock Bridge Affiliates; (2) that such directors were unqualified to manage the affairs of Cadant in a proper and disinterested manner; (3) that they planned to deplete Cadant's cash reserves in order to put in place self-dealing bridge loans; (4) that such directors planned to ignore any sources of financing other than unfair, unreasonably dilutive, self-dealing financing; (5) that they planned to take actions for the purpose of "squashing" the Cadant common stockholders; and (6) that they planned, in general, to place their own private interests above those of Cadant or its common stockholders. In addition, the Second Venrock Bridge Affiliates misrepresented the purpose of this financing.

621.    Cadant relied on these misrepresentations of the Second Venrock Bridge Affiliates in agreeing to issue to the Second Venrock Bridge Affiliates approximately $7,000,000 of Convertible Secured Bridge Notes.

622.    Due to the nature of the misrepresentations, Cadant was damaged substantially by issuing Convertible Secured Bridge Notes that were detrimental to Cadant and its common stockholders.

623.    Plaintiffs bring this action derivatively in the right of and for the benefit of Cadant to redress injuries suffered and to be suffered by Cadant as a direct result of the violations of law and breaches of duty, as well as the aiding and abetting thereof, by defendants. Cadant is named as a nominal defendant in this action solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this court which it would not otherwise have.

624.    Plaintiffs will adequately and fairly represent the interests of Cadant and its common shareholders in enforcing and prosecuting their rights, and has obtained experienced counsel, in the field of federal litigation.

625.    Any demand made by Plaintiffs to the Cadant Board of Directors to institute this action is excused because such demand would be a futile and useless act for the following reasons:

      (i)    The Cadant Board of Directors participated in the wrongs complained of;

      (ii)    The acts complained of herein constitute violations of law and the fiduciary duties owed by Cadant's Board of Directors, and these acts are incapable of ratification;

      (iii)    The known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the

Cadant Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(iv)     Cadant has been and will continue to be exposed to significant losses due to asset writedowns or sales at distress prices, yet the defendants have taken no action against themselves or other present or former employees of Cadant who were responsible for that wrongful conduct to attempt to recover for Cadant any part of the damages Cadant suffered and will suffer thereby;

(v)      The acts complained of herein are wrongful and the expenditure of funds complained of constitutes a waste of Cadant's assets, and thus are acts incapable of ratification;

(vi)     The Directors of Cadant cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the other defendants named herein who are responsible for the misconduct alleged in this Complaint, in that, inter alia, the Board of Directors is totally dominated by defendants who were personally and directly involved in the misconduct alleged, and to whose directives and views the Board has consistently acceded and will continue to accede. This domination of the Board of Directors by defendants has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

626. Each of the defendants named herein is responsible for the losses and damages suffered by Cadant.

627. The Cadant defendants, singly and in concert, engaged in the aforesaid fraudulent conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company and to the shareholders.

628. By reason of the foregoing, these defendants have caused Cadant to waste its valuable assets and otherwise unnecessarily expend its corporate funds, as a result of which Cadant has been substantially damaged.

629. Cadant has been injured by reason of these defendants' fraudulent conduct. Plaintiffs, as shareholders and representatives of Cadant, seek damages and other relief for the Company as hereinafter set forth.

**WHEREFORE** Plaintiffs pray that this Court award judgment in their favour and against defendants as follows:

1. Determining that this action is a proper derivative action maintainable under Rule 23.1 of the Federal Rules of Civil Procedure.

2. Against each defendant for restitution and/or damages in favor of the Plaintiffs, on behalf of Cadant and its common shareholders, and awarding punitive and exemplary damages as appropriate.

3. Awarding Plaintiffs the costs of this suit, including reasonable attorneys and experts fees and other disbursements.

4. Award Plaintiffs such additional relief as may be just and reasonable.

Plaintiffs demand trial by jury.

Plaintiffs, **JOHN P. KENNEDY et al.**

By: _____
One of their attorneys

Richard C. Leng
Attorney at Law
230 West Monroe, Suite 250
Chicago, IL 60606
(312) 857-1180

Williams Schifino & Steady P.A.
One Tampa City Center
201 North Franklin Street, Suite 2600

Tampa, FL  33601
(803) 221-2626

Schatz & Nobel P.C.
330 Main Street
Hartford, CT  06106
(860) 493-6290

Civil Cover Sheet

Page 1 of 1



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

# **Civil Cover Sheet**

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):** John P. Kennedy, et al. | **Defendant(s):**Venrock Associates |
| County of Residence: Cook County | County of Residence: |
| Plaintiff's Atty:  Richard C. Leng<br>Law Offices of Richard C. Leng<br>230 W. Monroe St., Suite 250<br>312-857-1180 | Defendant's Atty: |

*DOCKETED*

*JAN 1 7 2002*

*02C   0383*

II. Basis of Jurisdiction:  **4. Diversity (complete item III)**

III. Citizenship of Principle
Parties (Diversity Cases Only)
           Plaintiff:- **N/A**
           Defendant:- **N/A**

*JUDGE HOLDERMAN*

IV. Origin :  **1. Original Proceeding**

V. Nature of Suit:  **850 Securities / Commodities / Exchange**

VI.Cause of Action:  **15 USC Section 78a et seq.: Securities fraud.** MAGISTRATE JUDGE KEYS

VII. Requested in Complaint
        Class Action:
        Dollar Demand: **$100,000,000**
        Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _1/16/02_

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**   Revised: 06/28/00

NOTE: When the print dialogue box appears, be sure to uncheck the Annotations option.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
Eastern Division

Double click on question mark for appearance form instructions

In the Matter of

John P. Kennedy, et al.
v.
Venrock Associates, et al.

Case Number **02C  0383**

JUDGE HOLDERMAN

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Plaintiffs

MAGISTRATE JUDGE KEYS

DOCKETED

JAN 1 7 2002

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Richard C. Leng | NAME |
| FIRM Law Offices of Richard C. Leng | FIRM |
| STREET ADDRESS 230 W. Monroe St., Suite 250 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60606 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 857-1180 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER 70786 | IDENTIFICATION NUMBER |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES NO |
| | DESIGNATED AS LOCAL COUNSEL? YES NO |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER | IDENTIFICATION NUMBER |
| MEMBER OF TRIAL BAR? YES NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES NO | TRIAL ATTORNEY? YES NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO | DESIGNATED AS LOCAL COUNSEL? YES NO |